# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                    )
**VALDA T. JOHNSON, *et al.*,**          )
                                    )
      **Plaintiffs,**          )
                                    )
   **v.**                             )     **Civil Action No.  03-2513 (ESH)**
                                    )
**DAVID HOLWAY, *et al.*,**              )
                                    )
      **Defendants.**          )
_____ )


## <u>MEMORANDUM OPINION</u>

     Plaintiffs Valda T. Johnson, Stuart E. Bernsen and Elizabeth A. Baker are employees of the Pension Benefit Guaranty Corporation ("PBGC"), a federal agency, and former officers of the National Association of Government Employees ("NAGE") Local R3-77, a union representing PBGC's employees.  Proceeding *pro se*,[1] they initially filed suit on December 9, 2003, under the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 401 *et seq.*, to overturn a trusteeship that the national union had imposed on their local.  The Court denied plaintiffs' two motions to enjoin the imposition of an emergency trusteeship.  *See Johnson v. Holway*, 329 F. Supp. 2d 12 (D.D.C. 2004).  On January 3, 2005, plaintiffs filed an amended complaint against NAGE; David Holway, the union's national president; Stephanie Zaiser, then-trustee of Local R3-77 ("the local"); and Gerald Flynn, a union national vice president who presided at the trusteeship hearings.  The amended complaint alleges violations of the LMRDA and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, as well as defamation.  Presently before the Court is defendants' motion for summary judgment on all

_____
[1] Plaintiff Bernsen is, however, an attorney, and he has acted as plaintiffs' legal representative throughout these proceedings.

counts.  As explained below, defendants' motion is granted in part and denied in part.

## FACTUAL BACKGROUND

### I.      History of the Dispute Between Plaintiffs and NAGE

According to plaintiffs, the long and tortured history of their dispute with the national union begins with the National Association of Government Employees' national convention in September 2002.  (Pls.' Opp'n at 2-3.)  While in attendance as the elected representative of Local R3-77, plaintiff Bernsen expressed his disagreement with defendant Holway -- then a candidate for the NAGE presidency -- and members of the union's national leadership.  (*Id.*)  In a meeting of all assembled delegates, Bernsen declared that NAGE had failed to pay his local the full amount owed under a provision of the national union's constitution that channeled $30.00 of each member's annual dues to the member's local union.  (Bernsen Decl. Ex. 5 at 167.)  He proceeded to argue that the NAGE Constitution should be amended to provide for local allotments of $48.00 per member per year -- an increase three times greater than that proposed by candidate Holway -- in order to "make sure the local can pay for arbitrations."  (*Id.* at 166-69.)  Bernsen's remarks drew applause, and he was subsequently nominated to join a slate of candidates opposing Holway's bid for the union's national presidency.  (*Id.*; Bernsen Dep. at 223.)  After Holway prevailed in the election, Bernsen and other delegates filed a protest contesting the sufficiency of notice given prior to a convention vote selecting thirty members for newly-created executive board positions.  (Bernsen Decl. Ex. 6 at 2.)  The Department of Labor investigated the claim and ultimately filed a complaint against NAGE and its parent union, the Service Employee's International Union ("SEIU"), on August 8, 2003.  (*Id.*)

In the months following the national convention, NAGE officials received word that Local R3-77 was failing to meet financial obligations resulting from its arbitration of

discrimination claims against PBGC.  (Holway Decl. ¶ 6; Holway Decl. Exs. 2-3).  In a

November 11, 2002 letter to NAGE Chief Counsel Richard L. Barry, Arbitrator Roger Kaplan

stated that the local had long failed to pay its share of an arbitration bill and warned that "unless

[he] receive[d] the outstanding $3,500 . . . by Friday, November 22, 2002, [he] plan[ned] to sue

NAGE Local R3-77, NAGE National and Ms. Valda Johnson and Mr. Stuart Bernsen

individually to recover these just and earned fees."  (Holway Decl. Ex. 2.)  Arbitrator Kaplan

also complained of the local's attempt to challenge the amount of the bill, stating that "[n]ever"

in his thirty-one year career had he "received a letter as unprofessional as the one [he] received

from Mr. Bernsen."  (*Id.*)  Chief Counsel Barry immediately wrote plaintiff Valda Johnson,

president of Local R3-77, informing her that the local's dispute with Kaplan was a "very serious

matter [that] has an adverse impact on the National and other locals of this Union."  (*Id.*)  In July

of the following year, national officials received a statement from another arbitrator indicating

that Local R3-77 had again failed to pay its share of arbitration costs.  (Holway Decl. ¶ 6;

Holway Decl. Ex. 3.)

During the same period, Johnson, Bernsen and Baker, in their capacities as the President,

Executive Vice President and Secretary of Local R3-77, respectively, expressed mounting

frustration with the failure of the national's leadership to assist them in their arbitrations against

PBGC.  Since first taking office in 1999, plaintiffs had been vigorous in their pursuit of

members' employment discrimination claims against the agency.  (Bernsen Decl. Exs. 1 and 4;

Johnson Dep. at 199-200; Pls.' Opp'n at 4-5.)  They claimed several successes, including a

number of EEO settlements and an arbitrator's ruling that PBGC's EEO grievance procedure

was not fully compliant with governing regulations.  *See Johnson*, 329 F. Supp. 2d at 16.  PBGC

had become increasingly hostile to plaintiffs' frequent allegations of discrimination.  On June 20,

2001, after Johnson accused an agency manager of having refused to meet with a union official

because of the official's race, PGBC Human Resources Department Director Sharon Barbee

Fletcher filed an institutional grievance against the local president.  (Bernsen Decl. Ex. 1.)

Fletcher characterized Johnson's allegation as "outlandish . . . [,] unconscionable and

irresponsible," declaring it to be "but the latest of several completely unsupported allegations of

racism against the Corporation."  (*Id.* at 2.)  Fletcher complained that Johnson and Bernsen had

"repeatedly asserted that the Corporation unlawfully discriminates against its employees" though

they admitted, "when pressed," that "no third party has ever found that the Corporation has

engaged in unlawful discrimination -- not the Equal Employment Opportunity Commission, not

the Merit Systems Protection Board, not a federal court, and not an arbitrator."  (*Id.*; *see also id.*

(complaining that Local R3-77's March 2000 newsletter "compare[d] [the local's] fight against

the Corporation to the Allies' fight against Hitler and Nazi Germany in World War II").)  The

grievance concluded with three recommended remedies:  (1) that Johnson "apologize in writing"

to the manager she had accused of discrimination; (2) that "Local R3-77 cease making

unsupported allegations of racial discrimination;" and (3) that "before Local R3-77 decides to

file a grievance or proceed to arbitration, it obtain a signed certification from a NAGE national

representative that the representative has personally investigated the facts and believes the

grievance or arbitration request is appropriate under the circumstances."  (*Id.* at 3.)

According to plaintiffs, Fletcher posted her June 20, 2001 grievance on bulletin boards throughout PBGC's facility, marking the beginning of the agency's attempt to undermine plaintiffs' leadership of Local R3-77. (*See* Johnson Dep. Ex. 10. at 59.) In January 2002, PBGC's Executive Director informed Johnson that the local needed a "change in players" if its relations with the agency were to improve. (Johnson Dep. at 108.) Thereafter, Holway's predecessor at NAGE contacted Johnson to argue that Executive Vice President Bernsen was overly litigious and should be removed from the local's leadership. (*Id.* at 199-200; Pls.' Opp'n at 5-6.)

NAGE's conduct in the wake of Holway's election convinced plaintiffs that the parent union's loyalty remained with PBGC. (*Id.*) They openly complained to local members and NAGE officials that the union was providing insufficient legal and financial support for arbitrations despite the local's prior success. (*See* Bernsen Dec. Ex. 8.) In a January 16, 2002 letter to NAGE Chief Counsel Richard Barry, Bernsen protested the quality of representation members had received from the NAGE attorney assigned to handle the local's cases, indicated that he had been forced to handle much of the local's EEO work himself, and informed the union of six matters in which the local required effective national assistance. (Bernsen Decl. Ex. 4 at 2791-93.) Plaintiffs were dissatisfied with the union's response, complaining that NAGE had refused to provide representation in a number of arbitrations and EEOC hearings even after PBGC's motions for summary judgment in the cases had been denied. (*See* Pls.' Opp'n at 6; Bernsen Dep. Ex. 2.) Attempts by the local leadership to obtain the $3,048 in allegedly unpaid dues refunds also failed in the months following the national convention, thereby further fueling plaintiffs' disaffection with the national union. (*See* Johnson Dep. Ex. 24; Bernsen Decl. Ex. 8 at 2-3.) They ultimately concluded that NAGE's new leadership was conspiring with PBGC to

derail the local's pursuit of meritorious discrimination claims.  (Pls.' Opp'n at 5-6; Johnson Dep. 108-10, 199-200.)

Plaintiffs were particularly dissatisfied with the national union's handling of an arbitration that Johnson filed against PBGC after its posting of the June 2001 institutional grievance, wherein she alleged discrimination, retaliation and a hostile work environment.  (*See* Pls.' Opp'n at 6.)  According to plaintiffs, the NAGE attorneys assigned to Johnson's arbitration -- while initially supportive of her case -- ultimately attempted to force her into dropping a number of claims regarding denials of promotions on the basis of her race and her engagement in protected activities.  (Bernsen Decl. Ex. 8; Johnson Dep. at 21-28; Wasserstein Dep. at 25.) Johnson refused to abandon any portion of her case and chose to proceed with Bernsen as her representative and without the assistance of national union lawyers.  (Bernsen Decl. Ex. 53 at 9-10, 26.)  When President Holway notified Local R3-77 members by letter that the national union would not be accepting financial responsibility for Johnson's arbitration due to her "request[] that NAGE Attorneys withdraw from the case," Johnson responded with emails declaring that the national union had "never intended to pay for the case I carried to them . . . because they are interested in a 'cushiony' relationship with management without having to pay monies on our behalf." (Bernsen Decl. Ex. 10 at 1 (Holway's January 7, 2003 letter); Bernsen Decl. Ex. 8 (Johnson's January 15, 2003 email message to members).)

On December 13, 2002, subsequent to Johnson's decision to continue her arbitration without national assistance, President Holway and Chief Counsel Barry announced a formal arbitration policy whereby locals were required to submit all arbitrations to NAGE's legal staff for review before obtaining national assistance.  (Bernsen Decl. Ex. 10.)  Pursuant to this policy, those claims "found to lack merit" through a series of appeals would be denied the national

union's legal and financial support.  (*Id.*)  This procedure formalized the union's earlier method of determining whether to support an arbitration.  According to NAGE counsel Gina Lightfoot-Walker, the national union had previously allowed individual attorneys to determine whether a given arbitration was meritorious and therefore deserving of national support.  (Lightfoot-Walker Decl. ¶ 2.)  Plaintiffs viewed the policy as an infringement of their local autonomy and a violation of Article IVA of the NAGE Constitution, which left locals with the choice to pursue members' grievances under relevant collective bargaining agreements.

On May 27, 2003, Johnson filed an unfair labor practice charge against NAGE with the Federal Labor Relations Authority ("FLRA"), complaining that the union had violated its duty of fair representation in its handling of her arbitration and discriminated against her on the basis of her race, color, creed and sex.  (Zaiser Decl. Ex. B at 291.)  "[C]oncerned that the nature of the charge and the internal strife and dissention that surrounded th[e] matter might cause members of the Local to become concerned about their representation," President Holway wrote to all members of Local R3-77 on June 5, 2003.  (Holway Decl. ¶ 7; Zaiser Decl. Ex. B at 2.)  Holway provided each member with a copy of Johnson's charge and gave notice of a June 11, 2003 meeting "to discuss the future representation of NAGE with [the] local."  (Zaiser Decl. Ex. B at 1.)  Holway concluded the letter by stating:

> this is an emergency situation that requires me to act to the best of my ability to further the purposes and objectives of this organization and to protect the interests of its membership.  NAGE denies these charges and the purpose of this meeting is to ensure that your interests, as a NAGE member, continue to be protected.

(*Id.*)

At the June 11 meeting, President Holway expressed his frustration with Johnson's charges.  (Bernsen Decl. Ex. 65 at 3.)  According to Holway, none of the approximately twenty

local members at the meeting shared the concerns voiced in Johnson's charge, but instead, they expressed concern that the local's leadership was failing to provide them with sufficient information about union finances and other matters.  (Holway Decl. ¶ 7.)  At a later session of the National Executive Committee on July 30, 2003, Holway indicated that Johnson and Bernsen seemed to be "out of control," having filed discrimination charges that he believed to be without merit.  (Bernsen Decl. Ex. 17 at 1871.)

Three weeks after Holway's meeting with members of Local R3-77, NAGE National Executive Vice President James Farley wrote Johnson to request copies of local meeting minutes from the previous year.  (Holway Dec. Ex. 4.)  Johnson refused to provide the information, arguing that the local's bylaws did not require the distribution of written minutes and, regardless, it would be inappropriate to provide them due to the complaints made about NAGE representation by members at the meetings.  (Holway Dec. ¶ 7; Holway Decl. Ex. 5.)  In the wake of Johnson's refusal, President Holway learned that three of the local's officials -- Vice President-at-Large Robert Perry, and union stewards Jason Wolf and Jason Weyland -- had resigned out of frustration with plaintiffs' conduct.  (Holway Decl. ¶ 8; Holway Decl. Exs. 6 and 7.)  The resigning officials complained that plaintiffs routinely acted secretly and without membership meetings in violation of the bylaws; that plaintiffs did not share information regarding the local's finances and other matters; that plaintiffs retaliated against dissenters through smear campaigns; that plaintiffs had failed to negotiate a collective bargaining agreement for four years due to unapproved FLRA appeals; and that plaintiffs' spending on arbitrations had rendered the local insolvent.  (*Id.*)  These complaints were elaborated upon in a July 29, 2003 memorandum from the three former officials and ten other local members, which in turn was forwarded to President Holway on September 4, 2003.  (Holway Decl. ¶ 9; Holway

8

Decl. Ex. 8.)

On September 5, 2003, President Holway wrote members of Local R3-77 to inform them that he had received "a number of complaints" from their ranks and had accordingly appointed NAGE National Representative John Sabulis as a representative and monitor for the purpose of investigating the local and recommending appropriate action.  (Holway Decl. ¶ 11; Holway Decl. Ex. 9.)  Predictably, the monitor's activities engendered protests by the plaintiffs. According to Bernsen, Sabulis violated the autonomy of Local R3-77 by holding a membership meeting and attempting to exclude him and Johnson.  (Bernsen Dep. at 226; Bernsen Decl. Ex. 35.)  The monitor's investigation concluded with a November 24, 2003 report outlining a continued failure by the local leadership to disclose information to members and to allow their participation in the union's governance. (Holway Decl. ¶ 12; Holway Decl. Ex. 11.)  Based on these representational failures, the Sabulis report recommended the imposition of an emergency trusteeship.  (*Id.*)  President Holway received the same recommendation from National Vice President Deborah Ennis, who had assisted Sabulis in the investigation.  (Holway Decl. Ex. 13.)

## II.    Emergency Trusteeship

On November 24, 2003, calling upon his authority under Article XII of the NAGE Constitution, President Holway issued an order appointing Stephanie Zaiser as trustee of Local R3-77 and giving her full authority to "take charge and control the affairs" of the body.  (Zaiser Decl. at 1; Holway Decl. ¶ 12; Holway Decl. Ex. 15; NAGE Const. Art. XII, § 3.B(i).)  In explaining the action, Holway cited the Sabulis report and stated that each of the four conditions justifying the imposition of an emergency trusteeship under Article XII had been found: (1) "Local R3-77, through its misfeasance, malfeasance and non-feasance has failed to meet its duty of fair representation to its members;" (2) "Local R3-77 has failed to meet its financial

obligation to the National;" (3) "Local R3-77 has failed in its duty to the membership;" and (4) "Local R3-77 has failed to preserve and protect the assets, failed to meet its legal obligation, and failed in its other duties such that its obligation to its members, the National and the Local itself are not being met."  (Holway Decl. Ex. 15 at 1.)  The emergency trusteeship order directed members to cooperate with Zaiser and required the local's former officers to "immediately make available to the Trustee . . . all books, records, funds and other property of the Local in their possession and control."  (*Id.*)

On November 25, 2003, Bernsen filed a complaint against NAGE with the EEOC, claiming that his removal as a union officer by the national constituted retaliation for his having engaged in protected activity.  Bernsen filed an amended complaint with the EEOC on March 2, 2004, alleging that NAGE's retaliatory conduct had continued in the months since his initial filing.  (Bernsen Decl. Ex. 66.)  Johnson also filed an EEOC complaint on April 2, 2004, alleging that NAGE and Holway had retaliated against her for her civil rights activities and discriminated against her on the basis of race and sex.  (Johnson Dep. Ex. 9.)

As a result of the trusteeship, plaintiffs were prohibited from representing local members in pending arbitrations.  (Zaiser Decl. at 1.)  Trustee Zaiser also requested and received a sixty-day postponement in all pending arbitrations of member grievances, during which time she reviewed the cases and decided how the local should proceed.  (*Id.* at 1.)  Zaiser concluded that three of the pending grievances -- those of Johnson, Robinette Walters, and Rhonda Baird -- did not merit representation by either NAGE or Local R3-77.  (*Id.* at 2.)  Each of these members elected to pursue their claims without union assistance.  (*Id.*)  Zaiser later granted their requests to be represented in the arbitrations by either Bernsen or Dwayne Jeffers, a former local steward.  (*Id.*)

Thereafter, plaintiffs filed this action and moved for a temporary restraining order to enjoin the national union from imposing a trusteeship.  The Court denied the motion at a December 16, 2003 hearing, holding that plaintiffs had failed to show that the imposition of the trusteeship was in contravention of the NAGE Constitution or that it had been established in bad faith or for an improper purpose.  *Johnson v. Holway*, No 03-2513 (December 16, 2003 TRO Hearing Transcript).[2/]

### III.    Hearing Regarding the Trusteeship

On December 3, 2003, President Holway mailed notice of a December 22, 2003 hearing to the local membership.  (Holway Decl. ¶ 15; Holway Decl. Ex. 16; NAGE Const. Art. XII, § 3.B(iii).)  Holway appointed National Vice President Gerald A. Flynn as the hearing officer and informed Local R3-77 members that:

> [t]he decision to place the Local Union into trusteeship was based on reports of financial irregularities and a lack of response from the Local to a specific request for information [as well as] a number of complaints from the members of NAGE Local R3-77 claiming that the Local was not responding to requests for information from the membership, had failed to properly file and pursue grievances, had retaliated against members and had failed to meet its duty of fair representation to the membership.

(*Id.*)  He also reiterated the determinations of Sabulis and Ennis that the conditions justifying an emergency trusteeship under Article XII of the NAGE Constitution were satisfied.  (*Id.*)  Members were notified of their right to appear, "to answer said charges, to offer defenses and to otherwise dispute that just cause exists for the action taken."  (*Id.*)  In a December 11, 2003 letter to the local's membership, Holway stated that the materials on which he had based his

---

[2/]  The Court later rejected plaintiffs' second attempt to invalidate the trusteeship in an opinion issued on July 2, 2004.  *Johnson*, 329 F. Supp. 2d at 12.

emergency trusteeship decision were available for their review at the Washington hearing site. (Holway Decl. ¶ 16; Holway Decl. Ex. 17.)

The trusteeship hearing began on January 16, 2004, and extended into additional hearing dates during the following months.  (Zaiser Decl. Ex. E at 3.)  After considering the evidence presented at the hearing and the written statements of individual members, Hearing Officer Flynn issued his report and recommendation on August 24, 2004.  (*Id.* at 37.)  Flynn first concluded that President Holway had "little choice but to institute an emergency trusteeship to protect the interests of the members and to ensure the financial integrity of the Local" due to the evidence of financial malpractice, retaliatory conduct and dysfunctional governance within Local R3-77.  (*Id.* at 18.)  Flynn then recommended that the trusteeship be maintained based on the "overwhelming[]" evidence that the Local R3-77 Executive Committee had failed to cooperate with the Trustee by providing requested financial documentation, that the local had been rendered insolvent by arbitration costs, that Bernsen and Johnson had mishandled local funds and

banking records, and that the local's governance was improperly dominated by Johnson and Bernsen.  (*Id.* at 19-37.)

Flynn's report and recommendation was approved by a unanimous vote of NAGE's National Executive Committee on September 7, 2004, with President Holway, National Vice President Marc Lawson and Gerald Flynn abstaining.  (Zaiser Decl. Ex. E.; Barry Decl. ¶ 3.)

## IV.    Disciplinary Proceedings

As a result of the imposition of the trusteeship and the corresponding investigation, NAGE officials learned of two incidents which caused the national to institute disciplinary proceedings against Johnson and Bernsen.  On October 28, 2003, after Holway had announced the appointment of John Sabulis as monitor over the local, Bernsen closed a Wachovia account labeled "NAGE Local R3-77 Civil Rights Legal Defense Fund" and transferred its $1,540.57 balance into his personal account.  (Zaiser Decl. Ex. E at 23.)  Around November 26, 2003, two days after Holway's imposition of the emergency trusteeship, Johnson changed the address on the local's accounts from the union's post office box at PBGC to her home address without informing Trustee Zaiser.  (*Id.* at 22.)

By letters dated August 19, 2004, President Holway notified both Johnson and Bernsen that the union was contemplating disciplinary action against them and that hearings in their cases would be held before National Vice President Marc Lawson on September 14, 2004.  (Zaiser Decl. Exs. F and H.)  The letters informed Bernsen and Johnson of the conduct at issue, the constitutional violations alleged, and their opportunity to "answer the charges, to offer defenses, and to otherwise dispute that just cause exists for any disciplinary action."  (*Id.*)  Bernsen represented himself and Johnson at the hearings, cross-examining each of NAGE's witnesses. (Zaiser Decl. Exs. G and I.)  Both Bernsen and Johnson offered opening statements in their

defense; Bernsen presented closing arguments in each of the cases.  (*Id.*)  Though given the opportunity to do so, neither called witnesses.  (*Id.*)

Lawson's report and recommendation in Bernsen's case, issued on November 29, 2004, concluded that Bernsen should be expelled from the union.  (Zaiser Decl. Ex. I at 22.)  During the proceedings, Bernsen admitted closing the account and transferring the funds without notifying Trustee Zaiser.  (*Id.* at 12.)  Bernsen defended his conduct by arguing that he had opened the account three years earlier in order to collect private donations for the reimbursement of $10,000 he had paid in attorney's fees for two members' civil rights lawsuits.  (*Id.* at 7.) Lawson rejected this argument, finding that the donors had intended to make their contributions to the local, that Bernsen had opened the account in the local's name and with its tax identification number, that such an account would not have been required if it was intended only to reimburse Bernsen, and that Bernsen's explanation was contradicted by his own contribution to the civil rights account and his failure to take money from the fund in the years since its creation.  (*Id.* at 13-17.)

With respect to Johnson, Lawson's report, also issued on November 29, 2004, recommended that she be suspended.  (Zaiser Decl. Ex. G.)  Johnson, too, had admitted the conduct forming the basis of the disciplinary proceedings.  (*Id.* at 9.)  She denied having changed the local account's address in order to keep the statements from the Trustee, arguing that she had become concerned about PBGC's access to the mailbox where the statements had been delivered.  (*Id.* at 10.)  Lawson rejected Johnson's defense, finding that there was no change of circumstances giving PBGC greater access to the mailbox at that the time the address was changed, that Johnson admitted having learned of the trusteeship the day prior to her conduct, and that she had given no explanation for her failure to notify Trustee Zaiser of the account or

her actions despite three orders that she turn over all information regarding the local's finances. (*Id.* at 9-11.)

President Holway adopted Lawson's reports and recommendations on November 30, 2004, expelling Bernsen from Local R3-77 and suspending Johnson's membership in the union. (Zaiser Decl. Exs. G and I.)  Both appealed to the National Executive Board -- a body consisting of the National Executive Committee and thirty members selected at the national convention -- which appointed a five-member Judiciary Subcommittee to consider the matters.  (Barry Decl. ¶ 7.)  After reviewing the records in each case, the subcommittee recommended that the full board affirm the discipline of Bernsen and Johnson.  (*Id.* ¶ 8.)  The Executive Board did so by unanimous vote, with Holway, Lawson and Flynn abstaining.  (*Id.*)  Bernsen and Johnson were notified of the result, along with their right to appeal the decision to the National Convention, on June 15, 2005.  (*Id.* ¶ 9.)

Approximately one year after the imposition of the trusteeship, on December 17, 2004, Trustee Zaiser notified President Holway that Local R3-77 was ready to be returned to self-governance.  (Zaiser Decl. ¶ 8.)  A local election was held and new officers sworn in on February 2, 2005, at which time the trusteeship was terminated.  (*Id.* ¶ 9.)

## LEGAL ANALYSIS

Plaintiffs' eight-count Amended Complaint, filed on January 3, 2005, includes five categories of claims.  First, in Count 2 plaintiffs challenge the lawfulness of the trusteeship under the LMRDA and NAGE's Constitution, arguing that it was established and maintained in bad faith for an improper purpose and without proper procedures, contrary to 29 U.S.C. §§ 462 and 464(c).  (Amend. Compl. ¶¶ 89-122.)  They accordingly seek injunctive and declaratory relief under 29 U.S.C. § 464(a) and 28 U.S.C. § 2201.  (*Id.* ¶ 121.)  Second, in Count 1 plaintiffs

contend that NAGE imposed and maintained the trusteeship without sufficient procedures and for the purpose of suppressing their exercise of LMRDA-protected rights in violation of 29 U.S.C. §411 and 29 U.S.C. § 529.  (*Id.* ¶¶ 51-88.)  Third, in Counts 5 and 6 plaintiffs contend that NAGE disciplined Johnson and Bernsen without providing sufficient procedural protections and in retaliation for their exercise of LMRDA-protected rights, thus violating 29 U.S.C. §411 and 29 U.S.C. § 529.  (*Id.* ¶¶ 159-188.)  They ask that the Court restore them to union membership and award both compensatory and punitive damages.  (*Id.* ¶¶ 171-174.)  Fourth, in Counts 3 and 4 plaintiffs allege violations of Title VII.  In particular, they claim that Johnson, Bernsen and "other members of Local R3-77" were harassed and ultimately disciplined by NAGE in retaliation for their filing of or participation in the pursuit of discrimination claims and, in the case of Johnson, a black female, because of her race and sex.  (*Id.* ¶¶ 123-158.)  They further allege that NAGE has engaged in a pattern and practice of refusing to represent Local R3-77 members in their discrimination cases against PBGC.  (*Id.*)  This conduct, plaintiffs allege, constitutes discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, entitling them to compensatory damages, punitive damages, and restoration to union membership and office.  (*Id.* ¶¶ 139-142, 154-157, 183.)  Finally, in Counts 7 and 8 plaintiffs allege that various NAGE officials defamed them, entitling them to compensatory and punitive damages.  (*Id.* ¶¶ 189-206.)  The Court will address each of plaintiffs' claims *seriatim*.

## I.    Legal Standard

Under Federal Rule of Civil Procedure 56, a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

"Material facts" are those that "might affect the outcome of the suit under the governing law," and a dispute as to one is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Accordingly, a moving party is entitled to summary judgment against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 992 (D.C. Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

When considering a motion for summary judgment, the Court must draw every justifiable inference in favor of the nonmoving party and accept that party's evidence as true, while abstaining from any weighing of the evidence or the making of credibility determinations. *Anderson*, 477 U.S. at 255; *see also Washington Post Co. v. United States Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989). The nonmovant must offer more than unsupported allegations or denials, however -- affidavits or other competent evidence setting forth specific facts on which a reasonably jury could find in its favor are required if summary judgment is to be avoided. *Greene v. Dalton*, 164 F.3d 671, 674-75 (D.C. Cir. 1999). "While summary judgment must be approached with special caution in discrimination cases, a plaintiff is not relieved of [his] obligation to support [his] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Calhoun v. Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998), *aff'd*, 1999 WL 825425 (D.C. Cir. Sep. 27, 1999) (citation omitted).

## II.    Title III and the Lawfulness of the Trusteeship: Count 2

Under Title III of the LMRDA, labor organizations are permitted to impose trusteeships

over their subordinate unions only for particular purposes -- "correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization" -- and "only in accordance with the constitution and bylaws of the organization which has assumed trusteeship over the subordinate body."  29 U.S.C. § 462; *see also Ross v. Hotel Employees & Restaurant Employees Int'l Union*, 266 F.3d 236, 245-47 (3d Cir. 2001) (Title III intended to "protect[] the local union organization and its membership as a whole from the misuse of the trusteeship power.").  Once a trusteeship has been "established . . . in conformity with the procedural requirements of [the organization's] constitution and bylaws and authorized or ratified after a fair hearing," it is protected by an eighteen-month presumption of validity during which the trusteeship is vulnerable only to "clear and convincing proof that the trusteeship was not established or maintained in good faith for a purpose allowable under [§ 462]."  *Id.* § 464(c).  The statute authorizes the Secretary of Labor and "any member or subordinate body of a labor organization affected by any violation [of the trusteeship provisions]" to "bring a civil action in any district court of the United States having jurisdiction of the labor organization for such relief (including injunctions) as may be appropriate."  *Id.* § 464(a).

The purposes for which a trusteeship may lawfully be imposed are defined further in Article XII, Section 3 of the NAGE Constitution, which provides that the union's National President has the authority to "appoint a trustee to take charge and control" of a local upon determining that (1) the local, "through misfeasance, malfeasance, or nonfeasance," is failing "to meet its duty of fair representation to its members;" (2) the local is failing "to meet its financial obligations to the National, or to any other vendor or obligee;" (3) the local is failing "in its duty

to its membership;" or (4) the local is failing "to preserve and protect its assets, fail[ing] to meet

its legal obligations, or fail[ing] in any other duty such that its obligations to the members, the

National, the International, or the Local itself are not being met." (NAGE Const. Art. XII,

§§ 1(B), 3(B)(i).) When such a determination is made on an emergency basis, as was the case

here, NAGE's Constitution requires that notice of a hearing be sent to the local's officers within

ten days of the action, informing them of the reasons for the action and the specific violations

alleged. (*Id.* Art. XII, §§ 3(B)(ii)-(iii).) At the hearing, which may be held before the National

President or another designated person, "the officers and members of the Local against whom

such action has been taken shall have the opportunity to answer said charges, to offer defenses,

and to otherwise dispute that just cause exists for the action taken." (*Id.* Art. XII, § B(iii).) The

hearing must be held within thirty days of the trusteeship's imposition, with a decision issuing

within sixty days of the hearing's conclusion. (*Id.*)

Plaintiffs allege that the requirements of Title III and the NAGE Constitution were not

satisfied. (Amend. Compl. ¶¶ 89-122.) They argue that the hearing notices were insufficient,

merely parroting the language of the relevant union constitutional provisions and containing no

specific allegations; that the hearing was unfair due to NAGE's refusal to produce Holway and

other "essential" witnesses, the hearing officer's acceptance of NAGE documents without prior

authentication, the hearing officer's refusal to require production of certain documents by

NAGE, and the hearing officer's exclusion of documents offered by plaintiffs in rebuttal; that the

hearing was untimely, with a final decision issued 68 days after the final session; that the hearing

was "tainted" by the alleged participation of President Holway and Vice President Deborah

Ennis in the later vote affirming the trusteeship; and that Hearing Officer Flynn and NAGE

attorney Gina Lightfoot-Walker, Flynn's counsel throughout the hearings, suffered from

prejudicial conflicts of interest and bias.  (Pls.' Opp'n at 33.)  They further contend that national

officials imposed and maintained the trusteeship for the improper purpose of removing them

from office and thereby suppressing their pursuit of discrimination claims against PBGC.  (Pls.'

Opp'n at 34-35.)  *See Johnson*, 329 F. Supp. 2d at 14.  Plaintiffs accordingly request injunctive

and declaratory relief under 29 U.S.C. § 464(a) and 28 U.S.C. § 2201.  (Amend. Compl. ¶ 122.)

### A.      Mootness

As argued by defendants, plaintiffs' claim has been rendered moot by the February 2,

2005 termination of the trusteeship.  *See*, *e.g.*, *Air Line Stewards and Stewardesses, Local 550 v.

TWU*, 334 F.2d 805, 807-08 (7th Cir. 1964); *Morris v. Hoffa*, No. 99-5749, 2001 WL 1231741,

at *2 (E.D. Pa. October 12, 2001), *aff'd*, 361 F.3d 177 (3d Cir. 2004).  Plaintiffs seek the

termination of the trusteeship and the return of Local R3-77 to local control,  an outcome that

has already been achieved, thereby "preclud[ing] the possibility of meaningful relief." *Safe

Energy Coalition v. U.S. Nuclear Regulatory Comm'n*, 866 F.2d 1473, 1476 (D.C. Cir. 1989).

While plaintiffs attempt to salvage Count 2 by characterizing it as one seeking "damages as well

as injunctive and declaratory relief," their Amended Complaint cannot support such a claim.

(*See* Pls.' Opp'n at 31-32, n.32.)  Count 2 makes no reference to a damage award, speaking only

in terms of "[i]njunctive and declaratory relief," and the Amended Complaint's "Relief

Requested" section -- praying that the Court "[f]ind defendants liable to the plaintiffs in their

official capacities with respect to Counts 1, 2, 3, 4, 5, 6, 7, and 8" and award each of the

plaintiffs "at least $400,000 in damages and $800,000 in punitive damages" -- can be read only

as a request for individual damages rather than relief on behalf of the union.  (Amend. Compl. ¶¶

89-122, e-i.)  But, as plaintiffs concede, "Title III of the LMRDA does not provide for recovery

of personal damages by individual union officers."  (Pls.' Opp'n at 32, n.32.)  *See Ross*, 266 F.3d

at 257 ("Title III does not allow a private cause of action for individual damages . . . . Relief under § [464] must be sought on behalf of the local union organization and the entire membership must reap the benefits."); *Gesink v. Grand Lodge, Int'l Ass'n of Machinists & Aerospace Workers*, 831 F.2d 214, 216 (10th Cir. 1987); *see also* 29 U.S.C. 464(a) ("Any member or subordinate body of a *labor organization affected by any violation of* [*Title III*] . . . may bring a civil action . . . for such relief . . . as may be appropriate.") (emphasis added).

## B.        Plaintiffs' Procedural Challenges to the Trusteeship

Even assuming *arguendo* that plaintiffs' Title III challenge is not moot, they have nonetheless failed to demonstrate that the trusteeship was procedurally or substantively improper.  With respect to their procedural challenge, plaintiffs have failed to demonstrate that NAGE gave insufficient notice of the trusteeship hearings.  In his December 3, 2003 letter to the local, President Holway explained that the national union's decision to impose the emergency trusteeship had been based on "reports of financial irregularities and a lack of response from the Local to a specific request for information," as well as "a number of complaints from the members of NAGE Local R3-77 claiming that the Local was not responding to requests for information from the membership, had failed to properly file and pursue grievances, had retaliated against members and had failed to meet its duty of fair representation to the membership."  (Holway Decl. Ex. 16 at 1.)  The same letter summarized the constitutional basis for the trusteeship and notified all local members and former officers of the date and time of a hearing at which they would have the right "to appear . . . [,] to answer said charges, to offer defenses and to otherwise dispute that just cause exists for the action taken."  (*Id.* at 1-2.)  A later notice informed Local R3-77 members that the materials considered by Holway prior to his imposition of the emergency trusteeship were available for review and duplication at the hearing

site.  (Holway Decl. Ex. 17.)  Finally, when the initial hearing was postponed at Bernsen's

request, the local's membership was notified of the new hearing time and reminded of their right

to appear, to challenge the national union's action, and to submit written testimony.  (Zaiser

Decl. Ex. C. at 1-2.)  These letters, along with the materials made available for review, satisfied

the procedural requirements of the NAGE's Constitution and Title III.  *See* NAGE Constitution

Art. XII, § 3(B)(ii) (notice of reasons for action, the governing constitutional provisions, and the

time and place of the hearing required); *Morris v. Hoffa*, 361 F.3d at 187 ("Courts do not . . .

require any particular form of notice as long as the notice, together with any written

communications supplementing it, inform those concerned of the date and time of the hearing.");

*Becker v. Indus. Union of Marine & Shipbuilding Workers*, 900 F.2d 761, 768 (4th Cir. 1990)

(notice, which "may be found in written communications supplementing the notice giving the

date and time of the hearing," should provide the "factual basis for alleged violations of . . . the

union's constitution that justify imposition of a trusteeship," as well as "the date, time, and

location of the hearing and [an indication that] the local will have the opportunity to respond to

the charges").

Plaintiffs have also failed to show that the trusteeship hearings were unfair in violation of

Title III's requirement that a trusteeship be "authorized or ratified after a fair hearing either

before the executive board or before such other body as may be provided in accordance with [the

national union's] constitution or bylaws."  29 U.S.C. § 464(c); *see Becker*, 900 F.2d at 768

("Though Title III's 'fair hearing' requirement appears only in the subsection according a

presumption of validity to certain trusteeships, . . . a fair hearing is required for the valid

imposition of a trusteeship.").  During the course of the hearings, Trustee Zaiser presented six

witnesses and 44 exhibits in support of the trusteeship.  (Zaiser Decl. Ex. E at 4.)  Plaintiffs were

permitted to cross-examine each of the national union's witnesses and did so extensively,

subjecting more than one witness to multiple cross-examinations.  (*Id.*)  In three days of rebuttal,

plaintiffs presented three witnesses, 76 exhibits covering many hundreds of pages, closing

argument and a post-hearing brief.  (*Id.* 4-5.)  Plaintiffs' suggestion that the hearing officer

unfairly prohibited their submission of documents is not supported by the record, since both

parties were permitted to supplement the record well after the original deadline.  (*See* Bernsen

Dec. Ex. 44 (letter from Hearing Officer Flynn to Johnson stating that he had "afforded BOTH

sides ample requests for continuances and ha[d] allowed BOTH sides to submit documents well

beyond the stated deadline" but would "not be allowing any further continuances . . . because of

time restraints").)  Moreover, plaintiffs cannot succeed in their contention that the hearings were

unfair due to NAGE's refusal to produce Holway and other unnamed but "essential" witnesses,

Hearing Officer Flynn's failure to sustain plaintiffs' objections to certain documents, and

Flynn's failure to require production of other documents requested by plaintiffs.  (Pls.' Opp'n at

33 n. 33.)  "Internal union hearings are not held to the standards applicable to judicial

proceedings and are not required to provide the full panoply of procedural protections associated

with judicial proceedings such as . . . 'the technical rules of pleading, procedure and evidence.'"

*Mason Tenders Local Union 59 v. Laborers' Int'l Union of N. Am.*, 924 F. Supp. 528, 545

(S.D.N.Y. 1996), *aff'd*, 101 F.3d 686 (2d Cir. 1996) (unpub. table decision) (quoting *Frye v.*

*United Steelworkers of Am.*, 767 F.2d 1216, 1225 (7th Cir. 1985)); *C.A.P.E. Local Union 1983 v.*

*Int'l Bhd. of Painters*, 598 F. Supp. 1056, 1070 (D.N.J. 1984) ("The fair hearing requirement [of

Title III] . . . does not mean that trusteeship hearings need observe all the formalities of judicial

proceedings."); *Rauscher v. Bakery, Confectionary & Tobacco Workers Int'l Union*, Civ. No.

93-5629, 1993 WL 409192, at *2 (E.D. Pa. 1993) (the "minimal notice" standard applicable in

trusteeship cases "certainly does not contemplate that interested parties will be permitted to seek[] the functional equivalent of a request for production of documents"); *cf. United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 385 (2d Cir. 2001) ("[T]he right to subpoena witness is not a requirement of a 'full and fair' hearing under § 411(a)(5)(C).") (internal quotations omitted); *Yager v. Carey*, 910 F. Supp. 704, 715 (D.D.C. 1995) (Title I's "full and fair hearing" requirement does not require authentication or cross-examination of a charging party).  NAGE "present[ed] evidence and witnesses in support of the reasons for imposing the trusteeship." *See Becker*, 900 F.2d at 768-69; *see also Morris*, 361 F.3d at 187.  The former leaders of Local R3-77 were accorded ample opportunity to "cross-examine [the national union's] witnesses and present rebuttal evidence." *See Becker*, 900 F.2d at 768-69.  Accordingly, as concluded by the Department of Labor in its decision dismissing a challenge to the trusteeship, "NAGE conducted fair hearings."  (Zaiser Decl. Ex. J at 3.)

Plaintiffs' contention that the trusteeship hearing and the National Executive Board's later adoption of the hearing officer's recommendation was "tainted" by the participation of Hearing Officer Flynn, Gina Lightfoot-Walker, President Holway, and Vice President Deborah Ennis is equally unavailing.  Even in the context of "full and fair hearing" claims under Title I,[3]

---

[3] In referring to standards developed in cases brought under Title I's right to a "full and fair hearing," the Court does not mean to imply that they are controlling in the resolution of Title III claims, since the due process requirements under the "*full and fair hearing*" requirement of Title I -- which protects individuals' union membership and thus, in some cases, their livelihood, *see Int'l Bhd. of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers, ALF-CIO v. Hardeman*, 401 U.S. 233, 250 (1971) (Douglas, J., dissenting) -- may be more stringent than the protections provided by Title III's provision of a "*fair hearing* either before the executive board or before such other body as may be provided in accordance with [the union's] constitution or bylaws." *See* 29 U.S.C. §§ 411(a)(5)(C) (emphasis added), 411(b), 464(c) (emphasis added); *see also Tincher v. Piasecki*, 520 F.2d 851, 854 (7th Cir. 1975) ("Although there is a general national policy against judicial interference in the internal affairs of unions, 'that general policy is subject to important exception in specific areas in which Congress has found that the *interests of individual members* need special protection against the danger of overreaching by entrenched

a union tribunal may be found to be biased only when the plaintiff has offered specific

allegations demonstrating "actual bias" or a "significant risk of actual bias." *Wildberger v.*

*American Fed. of Gov't Employees*, *AFL-CIO*, 86 F.3d 1188, 1196 (D.C. Cir. 1996).  Such a

showing has not been made here.  With respect to their complaints regarding Flynn and his

advisor, plaintiffs have failed to offer any specific factual allegations demonstrating a

"significant danger" that the hearing officer was "incapable of hearing plaintiffs' case

impartially."  *See Wildberger*, 86 F.3d at 1196; *Yager*, 910 F. Supp. at 715.  While plaintiffs

maintain that Lightfoot-Walker represented NAGE in the administrative proceedings brought

against the union by Johnson, they have failed to offer any evidence suggesting that she was

biased as a result or that she played an "active part" in Flynn's deliberations and thereby

compromised his ability to decide the case impartially.  *See Yager*, 910 F. Supp. at 719 (rejecting

claim that executive board's allegedly biased counsel compromised the fairness of the board's

decision where there was no evidence that she had actively participated in its deliberations).

Plaintiffs' allegations that both Flynn and Lightfoot-Walker receive "substantial salaries [from]

NAGE" and fall "under the direction and control of Holway" also fail to provide a basis for any

inference of bias.  *See id.* at 715-16 (no impermissible bias found where plaintiff alleged hearing

panel members were "loyal" to charging president and had received strike benefits or committee

appointments from him).  Finally, plaintiffs' reference to an email in which Flynn expressed

frustration with Johnson's apparent "assertions regarding [his] character and . . . integrity" does

not constitute "significant danger" that the hearing officer would be unable to make an impartial

decision regarding the propriety of the trusteeship.  (Bernsen Decl. Ex. 44; Pls.' Opp'n at 33

n.36.)  Moreover, plaintiffs have offered no evidence to suggest a history of conflict involving

_____

union leadership.'") (internal citation omitted).

the hearing officer so as to raise an inference of bias.  *Cf. Wildberger*, 1188 F.3d at 1196

("significant risk of actual bias" where president responsible for finding probable cause and

rendering final decision had been both the subject of plaintiff's criticisms and his former

political opponent); *Goodman v. Laborers' Int'l Union of North America*, 742 F.2d 780, 784 (3d

Cir. 1984) (hearing tribunal biased where a majority of its members had been removed from

their union offices by the accused); *Tincher*, 520 F.2d at 855 ("significant danger of bias" where

a member of the hearing panel had been charged with misconduct by the accused in a collateral

proceeding); *Semancik v. United Mine Workers of America District # 5,* 466 F.2d 144, 156 (3d

Cir. 1972) (trial board consisting of supporters of the victor in a union election could not try

supporters of the losing faction for acts relating to the election).  In short, this email does not

demonstrate that Flynn had prejudged the case or was unable to resolve the trusteeship question

impartially.

Plaintiffs' challenge to the National Executive Committee's decision affirming Hearing

Officer Flynn's report and recommendation is similarly without merit.  According to plaintiffs,

the vote was improper due to the alleged involvement of Preident Holway, who had initially

imposed the trusteeship, and Vice President Ennis, who had recommended imposing the

trusteeship on an emergency basis, testified in the hearing for NAGE and characterized Johnson

and Bernsen as "uncontrollable rebels."  (*See* Pls.' Opp'n at 33 n.35; Bernsen Decl. Ex. 17 at 2.)

They also contest the Executive Committee votes of James Farley and Barbara Osgood, both of

whom the plaintiffs accuse of having "dealt antagonistically with the Local" in the past.  (Pls.'

Opp'n at 33 n.35.)  Plaintiffs, however, again fail to offer specific allegations to support a

finding that the Executive Committee's unanimous decision approving Flynn's report and

recommendation was clouded by actual bias or a significant risk thereof. *Cf. Laborers' Dist.*

*Council of Washington, D.C. v. Laborers' Int'l Union*, 306 F. Supp. 2d 22, 28 (D.D.C. 2004) ("Even if plaintiffs had made a showing that [the union's national vice president] proposed the reorganization plan out of animus toward them, such a showing was cured by the hearing panel's extensive findings in support of its recommendation to adopt the plan, and the [executive board's] unanimous fifteen-member vote to adopt this recommendation.").  As for Ennis, Farley and Osgood, plaintiffs have not demonstrated any history of personal conflict with the Local leadership that would justify an inference of bias.  *Cf. Wildberger*, 86 F.3d at 1196; *Tincher*, 520 F.2d at 855.  As for President Holway, this case is distinguishable from *Wildberger*, where the national union's president determined that an investigation was unnecessary and later rendered a final decision on the matter. *Wildberger*, 86 F.3d at 1196.  Holway's decision to impose the emergency trusteeship was preceded by more than two months of investigation by an appointed monitor.  *See id.* (concluding that the union's president could have preserved the fairness of the accused's disciplinary proceeding by appointing a committee of investigation responsible for the initial probable cause determination).  Moreover, Holway did not participate in the Executive Committee vote adopting Flynn's report and maintaining the trusteeship.  (*See* Zaiser Decl. Ex. E; Barry Decl. ¶ 3; Holway Dep. at 128-29.)  Accordingly, the Court cannot conclude that Local R3-77 was denied a fair hearing on the question of the trusteeship.

Finally, plaintiffs' objections to the timeliness of the hearing process must be rejected. Following the July 1, 2004 close of the trusteeship hearings, Flynn's report and recommendation was issued on August 24, 2004, a date within the sixty-day window established by the NAGE Constitution.  (Zaiser Decl. Ex. E at 2413; NAGE Const. Art. XII, § 3(B)(ii).)  While the Executive Committee did not adopt Flynn's report and recommendation until September 7, 2004, eight days beyond the union's constitutional deadline for a "decision" (Zaiser Decl. Ex. E

at 2428; NAGE Const. Art. XII, § 3(B)(ii); Pls.' Opp'n at 33 n.34), any such deviation was of a "slight and insignificant character." *See Jolly v. Gorman*, 428 F.2d 960, 965 (5th Cir. 1970). Because "precise compliance with the labor organization's constitutional procedures is not necessarily required as long as there is substantial compliance consistent with the purposes of the Labor-Management Reporting and Disclosure Act," the timing of the Executive Committee's vote was not fatal to the trusteeship. *Id.*

In short, plaintiffs have failed to raise a genuine issue as to whether the trusteeship was "ratified after a fair hearing either before the executive board or before such other body as may be provided in accordance with [NAGE's] constitution or bylaws." 29 U.S.C. § 464(c).

### C.   Plaintiffs' Substantive Challenge to the Trusteeship

The purposes for which a trusteeship may lawfully be imposed are limited under both Title III and NAGE's Constitution. *See* 29 U.S.C. § 462 ("Trusteeships shall be established and administered . . . only . . . for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization."); NAGE Const. Art. XII, § 1(B) (trusteeship may imposed when a local fails to meet its duty of fair representation, its legal or financial obligations, its duty to its membership, or any other duty, or fails to preserve and protect its assets). Plaintiffs argue that NAGE imposed the trusteeship on Local R3-77 in bad faith for the unlawful purpose of suppressing their protected challenges to discrimination within PBGC, thus violating the labor laws and NAGE's constitution.

Under 29 U.S.C. § 464(c), a trusteeship established in accordance with a union's procedural requirements and ratified after a fair hearing, as was the case here, is "presumed valid

for a period of eighteen months" and "not . . . subject to attack during such period except upon clear and convincing proof that the trusteeship was not established or maintained in good faith for a purpose allowable under section 462."  Thus, "[a]s long as the trusteeship is supported by at least one proper purpose, it is immaterial that the labor union which imposed the trusteeship also may have had an impermissible motive."  *Serv. Employees Int'l Union, Local No. 87 v. Serv. Employees Intern. Union, Local No. 1877*, 230 F. Supp. 2d 1099, 1105 (N.D. Cal. 2002); *C.A.P.E. Local 1983*, 598 F. Supp. at 1075 (D.N.J. 1984); *Morris*, 2001 WL 1231741, at *8; *see also Nat'l Assoc. of Letter Carriers v. Sombrotto,* 449 F.2d 915, 923 (2d Cir.1971).  The only question, then, is whether plaintiffs have offered evidence sufficient to support a finding of "clear and convincing proof that the trusteeship was not established or maintained in good faith for [an allowable] purpose."  *See* 29 U.S.C. § 464(c).  The answer is clearly no.

In justifying NAGE's establishment and maintenance of the trusteeship over Local R3-77, defendants identify three legitimate reasons for the action.  Defendants first argue that "there was clear evidence of financial malpractice," noting Hearing Officer Flynn's finding that the local had "in fact [been] rendered insolvent by the Local officers' incurring of arbitration costs that . . . amount[ed] to well more than twice the average annual income of the Local," as well as his determination that Bernsen had "breach[ed] his fiduciary duty" to the membership by closing the NAGE R3-77 Civil Rights Fund and transferring the funds into his own account.  (Defs.' Mem. in Supp. at 29; Zaiser Decl. Ex. E at 2396, 2403-05.)   Second, "there was unrefuted evidence of persistent obstruction by the former Local officers," citing Flynn's finding that "the Local's former administration actively sought to prevent the membership and the National from obtaining information regarding the Local's finances and the pending arbitrations."  (*Id.* at 29; Zaiser Decl. Ex. E at 2396.)  Finally, defendants contend that the evidence at the hearing

"revealed 'a complete breakdown of functional governance at the Local,' in that it was run not by the five-member Executive Committee, but instead by two individuals, Johnson and Bernsen." (Defs.' Mem. in Supp. at 30 (quoting Zaiser Decl. Ex. E at 2406).)

While plaintiffs challenge these justifications as pretextual, they have not met their burden of showing by clear and convincing evidence that the trusteeship was not established or maintained in good faith for a proper purpose. Responding to defendants' argument that the trusteeship was an appropriate response to the local's insolvency, plaintiffs assert that the local "had a positive bank balance of over $4,706 at the end of its August 31, 2003 fiscal year and was responsibly managing expenditures while carrying out its duties to provide representation." (Pls.' Opp'n at 34.) They add that Local R3-77 had prepaid two arbitrators, though not required to do so, and that NAGE had failed to provide financing and "loans."[4] (*Id.* at 34 n.39.) These allegations, even when accepted as true, do not create a genuine issue for trial. Regardless of the Local's August 31, 2003 bank balance, it is undisputed that the union's leaders had accumulated arbitration bills exceeding $12,000, more than twice the local's income in each of the previous two years. (Zaiser Decl. Ex. E. at 2396, 2404-05; Bernsen Decl. Ex. 26 (Trustee Zaiser's March

---

[4] Plaintiffs mischaracterize Holway's April 10, 2003 letter to NAGE's locals as establishing a system of "loans" for subordinate unions struggling with arbitration costs. In that letter, Holway informed local leaders that "[e]ffective May 15, 2003 if a local has an outstanding arbitration cost which has not been paid upon receipt, the National will pay the arbitration cost in full and will deduct the amount owed from the per capita refund check of that said local." (Bernsen Decl. Ex. 13.) The letter continued, "[i]f this causes a financial hardship for your local you can make arrangements for an alternate payment plan." (*Id.*) Thus, rather than creating a program providing additional funding for locals "having difficulty" meeting their arbitration costs, President Holway established a means of diverting the locals' own money to arbitrators whom had not been paid by a local. President Johnson acknowledged this in her response to Holway's letter, which asked that NAGE "approve an alternate payment plan that would deduct 50% rather than 100% of [Local R3-77's] per capita refund when [it] need[s] assistance from the program." (Bernsen Decl. Ex. 13; *see also* Johnson Dep. at 255, 290-1 (indicating that Holway "never responded" to the request or at least failed to do so "directly," and expressing uncertainty about the response of Beth Reardon, another NAGE official).)

24, 2004 report).)  Moreover, it is undisputed that Local R3-77 was delinquent in the payment of

two arbitrator's bills, only one of which had been challenged as excessive by plaintiffs.  (Holway

Decl. Exs. 2 and 3.)  Plaintiffs similarly fail to raise an issue as to their obstructive behavior,

asserting that "Bernsen had taken more than 20 boxes of documents to the union office" but

offering no response to evidence that they had ignored or evaded Trustee Zaiser's requests for financial information.  (*See* Zaiser Decl. Ex. E at  2398; Pls.' Opp'n at 35.)

Accordingly, defendants' motion for summary judgment is granted as it relates to Count 2 on the ground that the plaintiffs' challenge is moot, or in the alternative, there is no basis upon which a jury could infer that the imposition of the trusteeship was procedurally deficient or that there was clear and convincing evidence "that the trusteeship was not established or maintained in good faith for a proper purpose allowable under § 462 . . . ."  29 U.S.C. § 464(c).[5/]

### III.    Title I and the Lawfulness of the Trusteeship: Count 1

In Count 1 of their Amended Complaint, plaintiffs contend that the trusteeship and their removal from office were retaliatory and therefore unlawful under Title I of the LMRDA. (Amend. Compl. ¶¶ 51-88.)  Title I is regarded as a "bill of rights for union members," *Hammontree v. NLRB*, 925 F.2d 1486, 1510 (D.C. Cir. 1991) (*en banc*), establishing such protections as the right "to meet and assemble freely with other members;" the right "to express any views, arguments, or opinions;" the right "to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding;" the "equal right[] and privilege[] . . . to nominate candidates [and] vote in elections or referendums;" and the requirement that disciplinary action follow "written specific charges," a

---

[5/] As the Court previously ruled in rejecting plaintiffs' two motions for an injunction lifting the trusteeship, *see Johnson*, 329 F. Supp. 2d at 18, plaintiffs have not offered sufficient evidence to support a finding of clear and convincing proof that NAGE did not act in good faith in establishing and maintaining the trusteeship for the numerous legitimate purposes demonstrated by the national union.  While plaintiffs stress alternate, improper purposes for which the trusteeship might have been imposed and administered (*see* Pls.' Opp'n at 35-6), their evidence is not sufficient to meet the heightened standard applicable under Title III's presumption of validity.  *See* 29 U.S.C. § 464(c).

"reasonable time to prepare [a] defense," and "a full and fair hearing."  29 U.S.C. § 411(a).

Those who suffer an infringement of their Title I rights are authorized to "bring a civil action in

a district court of the United States for such relief (including injunctions) as may be

appropriate."  *Id.* § 412.

According to plaintiffs, there is "abundant evidence" to support a determination that their

Title I activities played "at least some role" in the November 24, 2003 establishment of the

trusteeship and thus -- because Title I entitles union members to a jury trial whenever "there is

evidence that protected activities played some role in [their] removal from union office" --

summary judgment cannot be granted.  (Pls.' Opp'n at 28-29.)  In attempting to draw a

connection between their removal from office and their Title I activities, plaintiffs note that the

trusteeship was imposed after they had openly criticized President Holway and clearly

communicated their intention to continue in the exercise of their rights to speak and sue.  (*Id.*)

They further maintain that "NAGE's November 24 notice of [their] removal . . . from office

provided no basis for the removals other than vague allegations of misfeasance, malfeasance,

and nonfeasance;" that the trusteeship hearing was unfair; and that the trustee denied local

funding for three pending arbitration cases upon taking office, demonstrating NAGE's

retaliatory purpose in taking over Local R3-77.  (*Id.*)

To the extent plaintiffs attempt to utilize the provisions of Title I as a alternate means of

challenging the trusteeship's validity, they ignore the demarcation between Title I and Title III.

Title III places substantive and procedural limitations on the establishment of trusteeships, and it

provides a mechanism for the enforcement of those limitations.  *See* 29 U.S.C. § 462 (restrictions

on the imposition of trusteeships); *id.* § 464(a) (civil action against labor organizations that fail

to comply with trusteeship limitations).  Once the validity of a trusteeship has been established

under Title III, any Title I challenge to its imposition is foreclosed.  *See Farrell v. Int'l Broth. of Teamsters*, 888 F.2d 459, 461 (6th Cir. 1989) (presence of an independent Title I challenge to the validity of a trusteeship would "reduce to surplusage those portions of Title III which provide a specific remedy improper establishment of trusteeships"); *Morris*, 2001 WL 1231741, at *10 ("Plaintiffs' argument that the imposition of the trusteeship violated their  rights of free speech under the LMRDA Bill of Rights is really just another way of saying that the trusteeship was invalid because it was imposed for an improper motive.").  The establishment of a trusteeship is in itself inconsistent with the full exercise of Title I rights, since it deprives the subordinate union's members of their ability to "nominate candidates, to vote in elections or referendums of the labor organization . . . and to . . . vot[e] upon the business of [membership] meetings."  *See* 29 U.S.C. § 411(a)(1).  Were Title I challenges to the imposition of trusteeships available under Title III, the latter would be rendered essentially meaningless.  Accordingly, "there can be no Title I recovery for valid use of the trusteeship mechanism."  *Morris*, 2001 WL 1231741, at *10.

This conclusion, however, is not without limits.  First, the absence of an independent Title I challenge to the establishment of a trusteeship does not insulate the trustee from Title I claims for actions taken after the establishment of the trusteeship.  As noted by Justice Marshall in *Sheet Metal Workers' International Association v. Lynn*, 488 U.S. 347 (1989), "nothing in the language of the LMRDA or its legislative history . . . suggest[s] that Congress intended Title I rights to fall by the wayside whenever a trusteeship is imposed."  *Id.* at 356.  As the Court concluded in that case, "a trustee's authority under Title III ordinarily should be construed in a manner consistent with the protections provided in Title I."  *Id.* at 357-58.  Thus, while Title I does not function as an independent limitation on the imposition of a trusteeship under the LMRDA, Title I does apply to a trustee's conduct in the administration of a trusteeship.

34

However, plaintiffs here challenge the installation of Trustee Zaiser rather than her conduct while in office, and thus, their claim does not fall within Justice Marshall's admonition.[6/] Second, Title III does not limit recovery for violations of Title I rights resulting from the invalid establishment of trusteeships.  It is for this reason that the Sixth Circuit, in *Thompson v. Office and Professional Employees International Union*, AFL-CIO, 74 F.3d 1492 (6th Cir. 1996), allowed a union member to introduce evidence challenging the propriety of an already-lifted trusteeship that had allegedly been imposed for the purpose of "quell[ing] democracy," in violation of Title I.  *Id.* at 1500 ("[B]ecause [plaintiff] alleged that his Title I rights were violated when the OPEIU *imposed the trusteeship to quell democracy*, the appropriateness of the trusteeship is still at issue.") (emphasis added).  Similarly, it is for this reason that the Sixth Circuit, in *Argentine v. United Steelworkers of America, AFL-CIO, CLC*, 287 F.3d 476 (6th Cir. 2002), affirmed an award of Title I damages after finding sufficient evidence to support an inference that the trusteeship in question had been improperly imposed for the purpose of removing vocal opponents of a nationally-supported collective bargaining agreement.  *Id.* at 483. Plaintiffs' reliance on these cases is misplaced, for plaintiffs were removed from office as a result of the imposition of a lawful trusteeship.

Therefore, the Court will grant defendants' motion for summary judgment as it relates to the Title I challenge to the establishment of the trusteeship contained in Count 1 of plaintiffs'

---

[6/] Plaintiffs' suggestion that the establishment of the trusteeship did not require their removal from office is without merit.  (*See* Pls.' Opp'n at 27 n.25)  Trustee Zaiser was appointed to "take charge and control the affairs" of Local R3-77 after President Holway determined that the local's present leadership was failing in its obligations to the membership.  Removal of the local's Executive Committee, therefore, was a necessary component of the trusteeship's creation.

Amended Complaint.[7/]

## IV.    Title I Challenges to Discipline and Other NAGE Actions: Counts 5 and 6

Although plaintiffs cannot challenge their removal as local officers under Title I, a number of their Title I claims remain to be addressed.  In Counts 5 and 6 of their Amended Complaint, plaintiffs contend that the disciplinary hearings resulting in Johnson's suspension and Bernsen's expulsion were untimely and unfair, violating both the NAGE Constitution and their right to a "full and fair hearing" under 29 U.S.C. § 411(a)(5).  (Amend. Compl. ¶¶ 165, 167, 179 and 181.)  Plaintiffs further allege that these disciplinary actions were motivated by President Holway's desire to retaliate against them for their exercise of rights protected under Title I, in violation of 29 U.S.C. § 529.  (Amend. Compl. ¶¶ 161, 166-67, 180-81.)  Finally, plaintiffs challenge various other NAGE actions, including the national union's failure to support local arbitrations, as violations of their Title I rights and those of other Local R3-77 members. (Amend. Compl. ¶¶ 60-62, 69, 72.)

### A.    Plaintiffs' Title I Procedural Challenges to the Disciplinary Hearings

Johnson and Bernsen contend that the national brought charges against them nearly eight months after learning of their alleged misconduct and thereby violated NAGE's Constitution, which provides that "[n]o charges may be filed more than six . . . months after the charging party learned, or could have reasonably learned, of the act or acts which are the basis of the charges." (NAGE Const. Art. XII, § 2(A).)  This six-month limitation, however, does not apply in this case.  NAGE Constitution Article XII, Section 2(A) applies only where charges are "[b]rought by [m]ember(s) of a [l]ocal [u]nit and [d]etermined at the [l]ocal [l]evel."  (*Id.*)  Article XII,

_____

[7/] Plaintiffs remaining Count 1 claims, which challenge various actions by defendants both before and after the establishment of the trusteeship under Title I, are addressed in Section IV, *infra*.

Section 3(A), which governs the National President's filing of charges against individual

members, is conspicuously free of the six-month restriction.  (*Id.* Art. XII, § 3(A)(i).)  Thus,

President Holway was "not limited" by Section 2 in filing disciplinary charges against Johnson

and Bernsen, and their challenge to the timing of his action must fail.  (*See id.*; *see also id.* Art.

XII, § 3(A)(ii) (limiting the timing of disciplinary hearings and decisions following the

president's filing of charges, but placing no restriction on when charges may initially be filed).)

     Johnson raises an additional timeliness argument with respect to her proceeding.  She

alleges that Holway's November 30, 2004 order suspending her union membership came 77 days

after the close of her disciplinary hearing on September 14, 2004.  Since Article XII, Section

3(A) of the NAGE Constitution requires that "[a] decision . . . issue within sixty (60) days

following the conclusion of the hearing," Johnson contends that she was improperly disciplined.

In citing September 14 as the date of the hearing's "conclusion," Johnson fails to acknowledge

that the hearing record in her case was held open well beyond that date in order to accommodate

her request to submit additional documentation.  (Zaiser Decl. Ex. G. at 2.)  Because a decision

could not properly be reached until the record had closed, Johnson's reliance on the September

14 date is misplaced.  Moreover, any arguable violation would be of "slight and insignificant

character," *cf. Jolly*, 428 F.2d at 965, especially since Johnson has failed to identify any resulting

prejudice that could have rendered her hearing "unfair."  *See* 29 U.S.C. § 411(a)(5).

Johnson and Bernsen also challenge the fairness of their disciplinary hearings, arguing that President Holway's role in the proceedings violated their Title I right to trial by an impartial tribunal.  *See* 29 U.S.C. § 411(a)(5); *Wildberger*, 86 F.3d at 1193 (Title I entitlement to a "full and fair hearing" includes "the right to trial by an unbiased tribunal").  In making this claim, plaintiffs rely on *Wildberger*.  There, a union member was expelled from the American Federation of Government Employees after the union's national president -- a one-time political opponent of the plaintiff and a subject of his criticism -- initiated and supervised an investigation into the plaintiff's alleged misconduct, determined the existence of probable cause after deciding that a committee of investigation was unnecessary, selected the trial committee, and rendered the final decision.  86 F.3d at 1196.  On appeal, the District of Columbia Circuit held that this exercise of prosecutorial, investigatory and adjudicatory functions by a president who had previously been criticized by the accused created a "significant risk of actual bias" in contravention of Title I.  *Id.*  The Court noted that such risk of bias could "easily" have been avoided through the appointment of "[a]n independent committee responsible for the probable cause determination," a move that would have protected the plaintiff from "any risk of prejudgment by . . . the ultimate decisionmaker."  *Id.*

While there is no question that  plaintiffs and Holway have had an antagonistic relationship, Holway's involvement in the disciplinary proceedings was not as pervasive as was the case in *Wildberger*.[8/]  Under the union constitution governing the disciplinary actions in that

---

[8/] Defendants have filed a Motion to Strike Plaintiffs' Surreply Brief, arguing that plaintiffs' surreply was improper in the absence of a cross-motion for summary judgment and noting that the plaintiffs' surreply raised new arguments under *Wildberger*.  (Defs.' Motion to Strike Pls.' Surreply at 1, 3.)  Since the Court rejects plaintiffs' *Wildberger* claims, defendants' motion will be denied as moot.

case, the national president was authorized to "either appoint a committee of investigation to determine whether probable cause exists for charging the accused or bypass a committee of investigation and appoint a trial committee." 86 F.3d at 1194-95.  The NAGE Constitution does not provide for the appointment of such an investigatory committee; rather, the decision to initiate disciplinary proceedings rests with the president.  (NAGE Const. Art. XII, § 3(A)(i)-(ii).) Thus, unlike the national president in *Wildberger*, President Holway did not bypass any available constitutional protections when he instituted the disciplinary proceedings against Johnson and Bernsen.  Moreover, the information underlying the charges against plaintiffs was not obtained as the result of an investigation supervised by President Holway, *see Wildberger*, 86 F.3d at 1190 (investigation conducted by office of national president responsible for charges), but rather it emerged in the course of the trusteeship hearing conducted by Hearing Officer Flynn.  (*See* Zaiser Decl. Ex. E at 22-3 (Flynn's Report and Recommendation).)  President Holway's role in the disciplinary hearings, therefore, did not violate plaintiffs' right to a trial by an impartial tribunal.[9]

Because plaintiffs have failed to show that their disciplinary hearings were procedurally defective, defendants' motion for summary judgment is granted with respect to plaintiffs' procedural challenges in Counts 5 and 6.

---

[9] Plaintiffs also allege that their disciplinary hearings were unfair because of Hearing Officer Lawson's refusal to allow testimony from Johnson's husband, the former working relationship of Lawson's attorney with NAGE counsel Richard Barry, and by the Executive Committee's previous decision following the trusteeship hearings.  (Pls.' Opp'n at 38 n.43.)  For the reasons discussed in Section II(B), *supra*, these allegations are insufficient to support a finding of unfairness.  Summary judgment is accordingly granted on these claims.

**B.      Plaintiffs' Title I Substantive Challenge to NAGE's Disciplinary Actions**

Plaintiffs claim that President Holway initiated disciplinary proceedings against Johnson and Bernsen in retaliation for their criticism of the national union and their filing of discrimination complaints, thereby violating the LMRDA's prohibition on disciplining members for their exercise of protected rights. *See* 29 U.S.C. § 529 ("It shall be unlawful for any labor organization . . . to . . . discipline any of its members for exercising any right to which he is entitled under the provisions of [the LMRDA]."); *id.* §§ 411(a)(2), (4) (rights to speak and sue). Though local members challenging the imposition or maintenance of a properly-established trusteeship must provide "clear and convincing proof that the trusteeship was not established or maintained in good faith for [an allowable] purpose" in order to prevail under Title III, 29 U.S.C. § 464(c), the standard in a Title I challenge to disciplinary action is much lower. As stated by the D.C. Circuit in *Lamb v. Miller*, 660 F.2d 792 (D.C. Cir. 1981), "[w]hen there is some evidence that the reason for [the discipline] was permissible and *some evidence* that the reason was impermissible, the question whether protected activities were a cause . . . must be resolved by a trier of fact." *Id.* at 794 (emphasis added).

Acknowledging this standard, defendants argue that "Plaintiffs offer abundant speculation but no evidence from which a jury could fairly infer that retaliation was . . . NAGE's true reason for disciplining Johnson and Bernsen." (Defs.' Rep. Mem. at 14 n.13.) Defendants, however, are incorrect in their contention that plaintiffs have provided no more than the "generalized contention that [their] vociferous criticism necessarily would have created animus towards [them]" and thus "the discipline rendered against [them] must have been motivated by that animus." *Cf. Commer v. McEntee*, 121 F. Supp. 2d 388, 398 (S.D.N.Y. 2000), *aff'd*, 15 Fed. Appx. 21 (2d Cir. 2001) (rejecting a Title I challenge where plaintiff had relied on such a

"generalized contention" and "shown no connection between the panel's decision and [his] speech activity").  While plaintiffs' showing may be far from compelling, given the long history of animosity between the plaintiffs and the national union, as reflected by President Holway's public statements, there is evidence that the disciplinary actions may have been initiated for a retaliatory purpose.  (*See* Pls.' Opp'n at 39-42; Johnson Dep. at 161-65; Bernsen Decl. Ex. 66 (Bernsen's November 2003 EEOC complaint); Johnson Dep. Ex. 9 (Johnson's April 2004 EEOC complaint).)  In particular, plaintiffs have offered evidence of President Holway's "hostility" toward them -- namely, his comments at the June 11, 2003 meeting he had called in response to Johnson's filing of her unfair labor practice charge against the national union.  (Pls.' Opp'n at 18, 39-42.)  According to a tape transcription submitted by plaintiffs, President Holway indicated at the meeting that he was "beside [him]self" and "shocked" by the charges, emphasizing that he had never before been accused of discrimination and characterizing Johnson's complaint as both outrageous and "personal."  (Bernsen Decl. Ex. 65 at 2-4, 46; *see also* Bernsen Dep. at 45; Bernsen Decl. Ex. 36 (Baker affidavit); Bernsen Decl. Ex. 50 (Baird declaration).)  Holway stressed that the union faced significant external threats and could not afford to be "fighting internally, because it really saps us."  (Bernsen Decl. Ex. 65 at 3.)  Holway also remarked that he was uncertain of his ability to represent Local R3-77 when the "integrity" of he and his staff was so questioned; "[i]f you don't want us," he concluded, "then we'll walk away."  (*Id.* at 5.)  Later in the meeting, Holway suggested that Bernsen had prepared Johnson's complaint and characterized the document as an attempt "to destroy [his] reputation, and the reputation of the people who work with [him]."  (*Id.* at 8; *see also* Bernsen Decl. Ex. 17 at 1871 (minutes of July 30, 2003 meeting at which Holway indicated that Johnson and Bernsen had filed meritless charges with the Department of Labor); Holway Dep. at 105 (Holway's

41

recollection that he asked Bernsen if he had drafted Johnson's charge because he "just wanted to see if [Bernsen] would be personal enough to stand up and admit [his] involvement in such an outrageous act" and remark that "of course . . . [Bernsen] shrunk from that responsibility").) Also, according to Bernsen, Holway stated that he had considered imposing a trusteeship or taking disciplinary action against Johnson and Bernsen because of the charge and "prior alleged incidents," yet had been advised by his lawyers that "he couldn't do it right then because it would be direct retaliation for Valda Johnson's Unfair Labor Practice charge."  (Bernsen Dep. at 45, 219-20; Bernsen Decl. Ex. 65 at 34-39.)

In light of this evidence, there is "some evidence" that NAGE and Holway "might have" disciplined Johnson and Bernsen for the misconduct identified during the trusteeship hearing, "but they might also have" disciplined them in retaliation for their exercise of Title I rights. *See Lamb*, 660 F.2d at 794-95 ("In this case, Miller and the IEB might have removed Lamb for his inadequate accounting for expenses, but they might also have dismissed him for his continued opposition to their policies."); *Gilvin v. Fire*, 259 F.3d 749, 757 (D.C. Cir. 2001) (genuine issue as to actual motive for suspension where international president attacked plaintiff for sending letters criticizing union policies to the membership, and declared that something had to be done to prevent him from circulating further criticism).  Accordingly, defendants' motion for summary judgment cannot be granted as it relates to plaintiffs' substantive Title I challenge to their discipline in Counts 5 and 6.

C.      Plaintiffs' Miscellaneous Title I Challenges to NAGE Actions

Plaintiffs also argue that a variety of other NAGE actions violated "Plaintiffs' and other

members' rights" under Title I by appointing a monitor and holding three membership meetings

without the approval of Local R3-77 President Johnson or the local's Executive Committee; in

attempting to exclude Johnson and Bernsen from another membership meeting and attempting to

prevent them from speaking there once they were admitted; in sending a "barrage of threatening

messages" to the local membership and refusing to treat plaintiffs as the local's leadership; and

in failing to provide legal and financial support for arbitration cases, "particularly" those of

Johnson and two other local members.[10/]  (Pls.' Opp'n at 25.)

Plaintiffs' contention that NAGE violated their rights and "members' rights to operate

their own local democratically, by majority rule and under their own bylaws," is without merit.

(Pls.' Opp'n at 26.)  Article VII, Section 3 of the NAGE Constitution authorizes the national

president to appoint a representative, hearing officer or monitor to "examine the internal needs of

the Local . . . and to assist . . . in determining what remedial action(s), if any, should be

implemented by the Local Unit."  (NAGE Const. Art. VII, § 3(F)(ii).)  The monitor's actions

here were consistent with this purpose and necessary to NAGE's reaching an informed decision

as to whether a trusteeship should be imposed.  *Navarro v. Gannon*, 385 F.2d 512 (2d Cir. 1967),

relied upon by plaintiffs, is not to the contrary.  In *Navarro*, the Second Circuit held that

plaintiff's Title I right to free expression would be violated if his national union acted on a threat

to assume control over a local meeting, concluding that members must be "free from inhibiting

---

[10/] Plaintiffs also contend that Title I rights were violated by NAGE's failure to pay Local R3-77
$3,048 in dues refunds.  (Pls.' Opp'n at 25.)  They have not, however, indicated any protected
rights that were allegedly infringed by this action, and the Court is unable to identify any. The
claim is accordingly rejected.

controls imposed on their meetings from without." *Id.* at 519.  The Court accordingly affirmed an injunction barring the national union from interfering with the local meeting. *Id.* at 521. Plaintiffs here do not allege that NAGE imposed "inhibiting controls" on their own meetings. Rather, they protest additional sessions called by the national union in furtherance of its investigation into "the internal needs of the Local."  (*See* NAGE Const. Art. VII, § 3(F)(ii).) Thus, the free speech violation found in *Navarro* is not present here, and summary judgment is granted with respect to this claim.

Summary judgment is similarly appropriate with respect to plaintiffs' claims that NAGE "attempted" to exclude them from a November 19, 2003 membership meeting and to prohibit them from speaking there, and that President Holway communicated directly with the local's membership and refused to treat plaintiffs as the local's elected officials.  (Pls.' Opp'n at 25.) On the contrary, the evidence demonstrates that plaintiffs were admitted and permitted to speak at the November 19, 2003 meeting.  (Bernsen Dep. at 226; Bernsen Decl. Ex. 35.)  As to President Holway's communication with local members and alleged refusal to "deal with the plaintiffs as officers," plaintiffs have not demonstrated that an infringement of their rights to expression and association resulted from such conduct.

Finally, plaintiffs have failed to offer sufficient evidence to support their contention that NAGE retaliated against Johnson for her attacks on the national union and PBGC by withholding its support for Johnson's arbitration against the agency and thus unlawfully "limit[ing]" her right[11] to "to institute an action" under Title I.  (*See* Pls.' Opp'n at 27.)  First, the record does not support Johnson's contention that NAGE attorneys Gina Lightfoot-Walker and Jennifer

---

[11] Plaintiffs, as discussed in Section V(A), *infra*, are without standing to raise alleged violations of other members' Title I rights.  Accordingly, summary judgment is granted as to those claims.

Wasserstein attempted to force her into abandoning allegedly meritorious discrimination or

retaliation claims.[12]   (*See* Pls.' Opp'n at 6.)  Although Johnson wanted to add claims that PBGC

had denied Johnson three separate promotions in retaliation for her exercise of protected rights

and due to her race, sex and religion, she did not raise these claims until after she had initiated an

arbitration challenging PBGC's June 21, 2001 institutional grievance and other agency actions as

discriminatory and retaliatory.  (*See* Bernsen Decl. Ex. 53 at 11-14 (arbitrator's decision

outlining procedural history of case); Wasserstein Dep. Ex. 1 at 6102.)  Rather than suggesting

an unwillingness on the part of NAGE to pursue such grievances, the unrebutted evidence

indicates that Wasserstein declined to pursue the additional claims as part of the December

arbitration only after making an unsuccessful request to PBGC that they be consolidated with the

posting grievance.  (*Id.*; Wasserstein Dep. at 25, 29-30; *see also* Johnson Dep. at 127 (stating

that she decided to rely on local representation "[b]ecause [she] didn't feel like Wasserstein had

enough time to look at what had been happening").)  Moreover, Wasserstein never withdrew

NAGE's offer to represent Johnson in her challenge to PBGC's posting of the institutional

grievance, a claim that itself involved allegations of discrimination and retaliation.  (Wasserstein

Dep. at 25; Wasserstein Dep. Ex. 1 at 6100, 6102; Bernsen Decl. Ex. 53 at 1-2 (arbitrator's

decision outlining claims).)  The propriety of Wasserstein's conduct is underscored by the

arbitrator's May 26, 2004 conclusion -- after fifteen days of hearings -- that he "d[id] not have

---

[12] Johnson's allegation that Lightfoot-Walker and Wasserstein attempted to coerce her into
taking a nonbargaining unit management position as part of a settlement with PBGC is also
unsupported.  Though both attorneys asked if Johnson would be willing to accept such a
position, there is no evidence that either pressed Johnson after she declined.  (*See* Johnson Dep.
Ex. 7 at 17 ("I was disturbed that the National Union was even asking the Union president to
consider taking a management position . . . ."); Johnson Dep. Ex. 10 at 61; Johnson Dep. at 125
(Johnson's belief that Lightfoot-Walker tried to coerce her based on her postponement of the
arbitration and later transfer the case to Wasserstein).)

jurisdiction over any of the Non-Selection/Promotions issues introduced by the Union during the hearings [and thus] [t]he Union and Agency should go forward with the separate arbitration that was initiated prior to the beginning of the[] hearings that commenced on December 12, 2002." (Bernsen Decl. Ex. 53 at 32.)[13/]

Johnson has also failed to show that NAGE amended its arbitration policy in a manner that suggests an improper motivation to limit her litigation rights.  According to Johnson, NAGE altered the conditions under which it would support local arbitrations on December 7, 2002, but this occurred after she had requested that NAGE withdraw from her case.  (*See* Bernsen Decl. Ex. 10.)   While plaintiffs argue that NAGE violated an "obligat[ion]" to the local and its members in refusing to support all arbitrations without reference to their merits, they have offered no evidence that such assistance was required under the NAGE Constitution or other any authority.[14/]  (*See* NAGE Const. Art. IVA (granting locals autonomy to pursue collective bargaining agreement grievances but making no reference to national financing); Johnson Decl. Ex. 4 at 4 (Johnson's statement, in response to a request for admission, that "David Holway . . . admitted that the cost of an arbitration should never be the key issue, but rather the merits"); Johnson Dep. at 205 ("[NAGE] made a lot of promises [regarding arbitrations].  And whether

---

[13/] Addressing the portion of the arbitration within his jurisdiction, the arbitrator concluded that "[t]here [wa]s no clear and convincing evidence that [PBGC] engaged in a policy to discriminate or retaliate against [Johnson] because of her race, sex, religion, union activity or EEO activity or to subject her to disparate treatment . . . .  Had the parties spent half of the energy and effort that was spent in fifteen days of hearings . . . (not to mention the hours spent in preparation before and after the hearing) on building an environment of open communications between both sides, this grievance might never have taken place."  (Bernsen Decl. Ex. 53 at 32.)

[14/] Johnson also maintains that NAGE denied Local R3-77 loans promised in an April 10, 2003 letter from President Holway.  This argument rests, however, on the same mischaracterization of the policy discussed in Section II(C), *supra*.

they put it down in the charter that they wrote, that they had to sign or not, they made oral

promises to us.  And they made written promises on campaign literature that they didn't

keep.").)  *See Johnson*, 329 F. Supp. 2d at 18 ("Plaintiff has provided no evidence that defendants

were required to represent members in disputes with PBGC, and the Court will not second-guess

a decision by the union to refrain from using the union's resources to support or continue to

support a member's case.").  Moreover, Johnson has not demonstrated that the formal policy

announced on December 7, 2002, was different in any relevant respect from that existing

previously, under which "it [wa]s up to the individual [NAGE] attorney to determine whether [a]

case [wa]s meritorious and warranted the use of NAGE's financial resources to pursue to

arbitration."  (*See* Lightfoot-Walker Decl. ¶ 2; Second Barry Decl. ¶ 2 ("When NAGE provides

legal representation for the arbitration, it pays for half of the union's share of the arbitrator's bill

and the local pays the remaining portion.  However, when a NAGE local elects to pursue a

grievance arbitration on its own, it is responsible for the entire portion of the union's share of the

arbitrator's bill.").)[15/]

## V.       Title VII Claims: Counts 3 and 4

Plaintiffs raise a number of Title VII claims against NAGE.  First, they contend that

NAGE had a "policy and practice" of "refusing to represent Local members in civil rights

---

[15/] Johnson's related contention that Trustee Zaiser's withdrawal of local support for her
arbitration on January 12, 2004, was also a retaliatory attempt to inhibit her exercise of protected
rights is also without merit.  Johnson's was one of three pending arbitrations denied further
assistance by Zaiser, and Johnson has offered no evidence suggesting an improper animus with
respect to each of the cases.  (*See* Zaiser Decl. ¶ 5.)  Zaiser's actions also belie any inference of a
retaliatory motive.  Subsequent to her January 12, 2004 decision, Zaiser designated Bernsen as
Johnson's representative in the matter, allowing him to have "official time" to work on the case,
and later wrote the arbitrator in order to confirm that the union had not withdrawn the grievance
and thereby deprived him of jurisdiction.  (*See* Johnson Dep. at 83; Zaiser Decl. ¶ 67; Bernsen
Decl. Ex. 53 at 10.)

matters" and "acquiescing to PBGC's discriminatory practices" in violation of the members' rights under 42 U.S.C. §§ 2000e-2(c)(1) and 2000e-2(c)(3).  (Pls.' Opp'n at 16; Amend. Compl. ¶ 158.)  In particular, they allege that the national union refused to support a number of meritorious discrimination claims brought by Local R3-77 members against PBGC and that it was motivated by hostility toward plaintiffs due to their civil rights activities and "by its desire to avoid being identified with minority and disabled employees."  (Pls.' Opp'n at 16.)  Second, Johnson and Bernsen[16] argue that NAGE retaliated against them for their participation in protected activities by removing plaintiffs from their union offices through the establishment of the trusteeship, by suspending Johnson and expelling Bernsen, by declining to treat the plaintiffs as "the leaders of an autonomous local," by excluding plaintiffs from attending or participating in meetings, and by failing to pay Local R3-77 the $3,048 in claimed back dues in violation of 42 U.S.C. § 2000e-2(c) and 3(a).  (*Id.* at 19-23; Amend. Compl. ¶¶ 123-158.)  Third, Johnson contends that NAGE discriminated against her by refusing to assist her in her arbitration of discrimination claims against PBGC in violation of 42 U.S.C. § 2000e-2(c).  (Pls.' Opp'n at 21-23.)  Finally, Johnson alleges that "there is evidence that Defendant Holway, a white male, was

---

[16] As to plaintiffs' suggestion that Baker was removed in retaliation for her participation in protected activities, they have offered no evidence of any such activities or that she even filed an EEOC complaint.  Thus, summary judgment is granted as to Baker's Title VII claims.  *See Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) ("Title VII requires that a person complaining of a violation file an administrative charge with the EEOC and allow the agency time to act on the charge."); 42 U.S.C. § 2000e-5(f)(1).

hostile to Plaintiff Johnson because she was a black female" in violation of 42 U.S.C. § 2000e-2(c).  (*Id.* at 23.)

### A.    Plaintiffs' Standing to Raise Claims on Behalf of Local Members

In order to satisfy the standing requirements of Article III, a plaintiff must demonstrate, among other things, that he has suffered an "injury in fact" -- one that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 176, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992)).  Thus, a plaintiff "'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).  These requirements continue throughout the course of the ligitation; "if the plaintiff loses standing at any time during the pendency of the proceedings . . . the court loses jurisdiction." *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 69 (2d Cir. 2001).

Applying these principles, the Court concludes that plaintiffs are without standing to raise the Title VII claims of other Local R3-77 members allegedly injured by NAGE's "policy and practice" of refusing to support members' discrimination claims against the agency.[17] While "a litigant may raise a claim on behalf of a third party if the litigant can demonstrate that he or she has suffered a concrete, redressable injury, that he or she has a close relation with the third party, and that there exists some hindrance to the third party's ability to protect his or her

---

[17] Notably, the Title VII provision cited by plaintiffs in support of the proposition that unions may not engage in a "pattern or practice" of resisting members' rights relates to the Attorney General's authority to file civil actions.  *See* 42 U.S.C. § 2000e-6(a).

own interests," *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 629 (1991), such a showing

is lacking here.  Plaintiffs maintain that they "sued on behalf of the Local . . . as officers and as

the majority of the Local's Executive Committee."[18/] (Pls.' Opp'n at 2.)  However, plaintiffs

were removed from office by the imposition of the emergency trusteeship prior to their January

3, 2005 filing of the Amended Complaint in which their Title VII claims were first raised.  (*See*

*id.*)  Moreover, plaintiffs have presented no evidence suggesting that other members of the local

are somehow hindered from pursuing their own Title VII claims.  Accordingly, summary

judgment is granted as to all of plaintiffs' claims that purport to raise the rights of other Local

R3-77 members.

### B.      Governing Legal Standard

Under 42 U.S.C. § 2000e-2(c), a labor organization is prohibited from "exclud[ing] or . . .

expel[ling] from its membership, or otherwise to discriminat[ing] against, any individual because

of his race, color, religion, sex, or national origin."  Under 42 U.S.C. § 2000e-3(a), a labor

organization is forbidden from "discriminat[ing] against any member . . . because he has

opposed any practice made an unlawful employment practice" by the statute or "because he has

made a charge, testified, assisted, or participated in any manner in an investigation, proceeding,

or hearing under [Title VII]."  Once a plaintiff has shown that she suffered an adverse action, she

may prove unlawful discrimination or retaliation in one of two ways.  First, "[a] plaintiff may

always prove a claim of discrimination [or retaliation] by introducing direct evidence of

discriminatory [or retaliatory] intent."  *McGill v. Munoz*, 203 F.3d 843, 845 (D.C. Cir. 2000);

---

[18/] Though plaintiffs suggest in their Amended Complaint that Bernsen "be appointed as group or class representative of those employees to pursue claims they have against NAGE," this case is not a class action.  Nor can plaintiffs rely on a theory of organizational standing. *See Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

*Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("[T]he *McDonnell Douglas*

test is inapplicable where the plaintiff presents direct evidence of discrimination.").  Second, a

plaintiff may proceed under the *McDonnell Douglas* framework by demonstrating, in a

discrimination case, that she is a member of a protected class and "the unfavorable action gives

rise to an inference of discrimination," *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999), or,

in a retaliation case, that the adverse action suffered was causally related to her previous

participation in protected activities.  *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir.

1984).  Once this prima facie case is established, it becomes the defendant's burden to articulate

a "legitimate, nondiscriminatory reason" for the action and thereby "dissolve[]" the presumption

of discrimination or retaliation raised by the plaintiff's prima facie case.  *Thomas v. National

Football League Players Ass'n*, 131 F.3d 198, 202 (D.C. Cir. 1997).  When this occurs, the

burden returns to the plaintiff, who must demonstrate by a preponderance that the reason offered

by the defendant -- while legitimate -- was a pretext for an unlawful motive.  *McKenna*, 729 F.2d

at 790.

## C.    Johnson and Bernsen's Retaliation Claims

Under this standard, Johnson and Bernsen have presented sufficient evidence to support a

finding that their removal from office and later discipline were adverse actions taken in

retaliation for their protected conduct rather than for the legitimate reasons offered by

defendants.  It is undisputed that both engaged in protected activity known to NAGE by

"oppos[ing] . . . practice[s] made . . . unlawful employment practice[s]" by Title VII and

"participat[ing] in . . . proceeding[s]" under the statute.  *See* 42 U.S.C. § 2000e-3(a).  Johnson

filed a May 27, 2003 unfair labor practice charge and an April 2, 2004 EEOC complaint against

NAGE, both of which alleged discriminatory and retaliatory conduct on the part of the national

union.  (*See* Zaiser Decl. Ex. B at 291; Johnson Dep. Ex. 9; *see also* Bernsen Decl. Ex. 8.)

Bernsen assisted Johnson in her arbitration following NAGE's withdrawal, defended Johnson's

charge at Holway's June 11, 2003 meeting, and later filed his own November 25, 2003 EEOC

complaint against the national union based on a claim of retaliation.  *See* Bernsen Decl. Ex. 7;

Bernsen Decl. Ex. 53 at 8; Bernsen Decl. Ex. 66 at 34-39.)  A reasonable jury could also find

that the union "took some meaningful adverse action against [plaintiffs] as . . . union

member[s]," *Thorn v. Amalgamated Transit Union*, 305 F.3d 826, 831 (8th Cir. 2002), as it is

undisputed that both Johnson and Bernsen were removed from office on November 24, 2003 and

later suspended or expelled from membership on November 30, 2004.[19]  Finally, there is

---

[19] While Johnson contends that NAGE's denial of arbitration assistance was an adverse action amounting to retaliation and discrimination in violation of Title VII, her claim cannot survive. As discussed in Section IV(C), *supra*, Johnson has not offered evidence sufficient to support a finding that the national union denied her arbitration assistance in retaliation for her engaging in protected activities.  And while there is ample evidence of animosity toward Johnson among PBGC managers (*see* Bernsen Decl. Ex. 1 (PBGC's institutional grievance against Johnson); Bernsen Decl. Ex. 55 (April 2005 arbitrator's decision noting hostility toward Johnson and Bernsen in some quarters of PBGC), Johnson has failed to show that NAGE discriminated against her by denying arbitration assistance as part of scheme to aid and abet PBGC in its discriminatory conduct.  *Cf. Goodman v. Lukens Steel Co.*, 482 U.S. 656, 668-69 (1987) (holding that a union discriminated against members under "a policy of refusing to file grievable racial discrimination claims however strong they might be" because Title VII "do[es] not permit a union to refuse to file any and all grievances presented by a black person on the ground that the employer looks with disfavor on and resents such grievances"); *Johnson v. Palma*, 931 F.2d 203, 206 (2d Cir. 1991) ("[A] plaintiff establishes retaliation by showing that the union acquiesces in a company policy that abridges the statutory rights of the plaintiff.").  As discussed, the record does not support Johnson's claim that "NAGE refused . . . to provide representation or financial support."  (Pls.' Opp'n at 21.)  Instead, it is undisputed that the national union attempted to consolidate her promotion claims into the scheduled arbitration and never withdrew its offer of representation with regard to her challenge to PBGC's institutional grievance, a claim that involved allegations of discrimination and retaliation (*see* Wasserstein Dep. at 30; Wassterstein Dep. Ex. 1; Bernsen Decl. Ex. 53 at 1-2), but it was Johnson who ultimately declined NAGE's offer of assistance.  (*See* Wasserstein Dep. Ex. 1; Johnson Dep. at 127 (acknowledging that she chose to have the local handle her arbitration "[b]ecause [she] didn't feel like Wasserstein had had enough time to look at what had been happening").)

All other actions raised by plaintiffs -- including Holway's alleged refusal to deal with them as "the leaders of an autonomous local," their alleged exclusion from meetings, and

sufficient evidence to support a finding that plaintiffs' protected activities were causally related to the adverse actions they suffered. *See McKenna*, 729 F.2d at 790 ("[T]h[e] initial burden is not great. Plaintiff merely needs to establish facts adequate to permit an inference of retaliatory motive."). First, the timing of plaintiffs' protected conduct and the adverse actions suggests a causal relationship. *See Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir. 1980) ("[C]ourts have recognized that proof of causal connection can be established indirectly by showing that protected activity is followed by discriminatory treatment."). Johnson and Bernsen were removed from office less than six months after the filing of Johnson's unfair labor practice charge against the union. Moreover, plaintiffs were notified of their disciplinary charges within five months of their final filings against NAGE with the EEOC. *See, e.g., Sanders v. Veneman*, 211 F. Supp. 2d 10 (D.D.C. 2002) (holding that a "five-month period . . . between the plaintiff's participation in protected activity and the defendant's allegedly adverse action is sufficient to establish a causal connection").

In response, defendants contend that both the trusteeship and plaintiffs' discipline were legitimate responses to Johnson and Bernsen's misconduct and that plaintiffs "have no evidence -- only bald assertions of discrimination -- that NAGE's reasons for [the contested actions] were pretextual." (Pls.' Opp'n at 42.) While defendants have proffered many legitimate reasons for their actions, it cannot be held as a matter of law that no reasonable jury could find lack of pretext. As discussed in Section IV(B), *supra*, the timing of NAGE's actions, coupled with

---

NAGE's alleged failure to pay Local R3-77 $3,048 in back dues -- are not sufficiently adverse to support a Title VII claim. *See Thorn*, 305 F.3d at 831; *see also Dickerson v. SecTek, Inc.*, 238 F. Supp. 2d 66, 73 (D.D.C. 2002) "actions imposing purely subjective harms, such as dissatisfaction or humiliation, are not adverse" as there "there must be some objective harm: 'a tangible change in the duties or working conditions constituting a material employment disadvantage'") (citations omitted).

President Holway's comments regarding Johnson and Bernsen at his June 11, 2003 meeting with

local members and at the July 30, 2003 National Executive Committee meeting, a could support

a finding of retaliation.  *See Rountree v. Johanns*, 382 F. Supp. 2d 19, 31 (D.D.C. 2005) (direct

evidence that supervisor "los[t] confidence" in plaintiff who had participated in coworker's EEO

activities and believed that the plaintiff "should [not] have worked against [he] or [the]

employer" by assisting the coworker was sufficient to find retaliatory animus in plaintiff's

reassignment and eventual removal).[20]  Accordingly, defendants' motion for summary judgment

is denied with respect to Johnson and Bernsen's Title VII challenge to their removal and

discipline.

## VI.     Defamation Claims: Counts 7 and 8

Plaintiffs allege that defendants Holway, Zaiser and Flynn made defamatory statements

in the course of imposing the trusteeship and subjecting Johnson and Bernsen to disciplinary

action.  (Compl. ¶¶ 189-206.)  Though plaintiffs allude to the challenged remarks in their

Complaint, the precise language at issue is set forth most clearly in their Opposition to Summary

---

[20] Johnson also contends that NAGE was motivated by an intent to discriminate against her on
the basis of her race and sex.  (*See* Pls.' Opp'n at 23 ("[T]here is evidence that Defendant
Holway, a white male, was hostile to [her] because she was a black female.").)  In attempting to
rebut the legitimate reasons offered by NAGE, Johnson offers two pieces of evidence: first, the
trustee's appointment of Dick Petta, "a white male who [did] not fight on behalf of EEO claims,"
to a number of committees that Johnson had headed before her removal and, second, President
Holway's alleged refusal to meet with Johnson during a period in which he was "having
conversations with Jason Weyland and Jason Wolf and Robert Perry and Dwayne Jeffers," all
male members of the local.  (Johnson Dep. at 93-95, 101.)  This is not, however, sufficient
evidence of pretext to support a reasonable jury in concluding that NAGE was motivated by an
intent to discriminate on the basis of Johnson's race or sex.  Thus, defendants' motion for
summary judgment is granted as it relates to Johnson's allegations of race and gender
discrimination.

Judgment.  (*See* Pls.' Opp'n at 42-43.)[21/]

A statement is defamatory when "it tends to injure [a] plaintiff in his trade, profession or community standing, or lower him in the estimation of the community."  *Olinger v. Am. Sav. & Loan Ass'n*, 409 F.2d 142, 144 (D.C. Cir. 1969).  Generally, a plaintiff bringing a defamation claim under District of Columbia law has the burden of proving (1) "that the defendant made a false and defamatory statement concerning the plaintiff;" (2) "that the defendant published the statement without privilege to a third party;" (3) "that the defendant's fault in publishing the statement amounted to at least negligence;" and (4) "either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm."  *Klayman v. Segal*, 783 A.2d 607, 613 n.4 (D.C. 2001) (internal quotations omitted).  A heightened standard applies when the statements in question are subject to a qualified privilege.  In such a case, a defendant may be held liable only when the plaintiff demonstrates that the

---

[21/] The eight statements include: (1) President Holway's remark to local members in his Order of Emergency Trusteeship that "Local R3-77, through its misfeasance, malfeasance, and nonfeasance has failed to meet its duty of fair representation to its members," a declaration allegedly posted on "public PBGC bulletin boards" by Trustee Zaiser on November 25, 2003; (2) President Holway's identical statement in a December 3, 2003 hearing notice to local members allegedly posted by Zaiser on public PBGC bulletin boards; (3) Trustee Zaiser's suggestion to members at a March 23, 2004 meeting that Johnson and Bernsen had engaged in "embezzlement" by improperly taking money for Local R3-77; (4) Trustee Zaiser's statement to members at a May 13, 2004 meeting that Bernsen had taken money that "belonged to the union"; (5) Trustee Zaiser's statement near a public area at PBGC's offices that Bernsen "stole money from the union and usually when you steal money you go to jail"; (6) an August 23, 2004 email message from Trustee's Zaiser's to members on PBGC's network containing President Holway's remarks that Johnson and Bernsen had failed to provide the trustee with "funds and other property of NAGE Local R3-77" and that Bernsen had appropriated some of the local's money; (7) a September 7, 2004 email message from Trustee Zaiser to members on PBGC's network reporting Hearing Officer Flynn's conclusions that Johnson, Bernsen and Baker were guilty of "financial malpractice," "breach of fiduciary duty," and "malfeasance;" and (8) a December 7, 2004 email from Trustee Zaiser to members on PBGC's network distributing documents from Holway and Hearing Officer Lawson, all of which stated that Johnson and Bernsen had engaged in "misfeasance and nonfeasance."  (*See* Pls.' Opp'n at 42-43.)

defamatory statements were made with actual malice or excessive publication.  *Moss v.
Stockard*, 580 A.2d 1011, 1024 (D.C. 1990); *Alade v. Borg-Warner Protective Serv. Corp.*, 28 F.
Supp. 2d 655, 656 (D.D.C. 1998).

A showing of actual malice or excessive publication is required here, for each of the
challenged statements was made by national union officials to members of Local R3-77 and each
addressed the alleged misconduct of the local's leadership and the appropriate union response.
Thus, each of the statements falls within the common interest privilege.  *Alade*, 28 F. Supp. 2d at
656 (*Moss*, 580 A.2d at 1024); *Manbeck v. Ostrowski*, 384 F.2d 970, 974 (D.C. Cir. 1967)
(statement by local president to membership regarding the union's attorney protected due to
mutual interest of all in the quality of the lawyer's representation); *Blake v. Trainer*, 148 F.2d
10, 12 (D.C. 1945) ("[T]here is no doubt that a[] [national] officer of a union has a qualified
privilege when he makes a statement informing the [local] union of any supposed dereliction of
duty of its officers."); *see also Sullivan v. Conway*, 157 F.3d 1092, 1098 (7th Cir. 1998)
(protecting announcements by trustee to members of the local union "who had a vital interest in
receiving candid communications from the trustee concerning his administration of the local").

While plaintiffs do not dispute the applicability of the common interest privilege, they
argue that defendants have lost the benefit of the privilege through excessive publication --
communicating each of the statements "to those with no common interest in the information" or
in a manner "not reasonably calculated to protect or further the interest." (Pls.' Opp'n at 45-46.)
*Moss*, 580 A.2d at 1024.  A reasonable jury, however, could not find that the statements at issue
were published excessively.  To begin with the challenged emails from various national officials,
plaintiffs suggest that the messages could be "easily transmitted" by the local members who
received them "to anyone else at PBGC or worldwide on the web."  (Pls.' Opp'n at 45; Pls.'

56

Surrep. at 24.)  Whether such transmissions occurred, such publication would be "no fault of defendants," and therefore cannot serve as a basis for defeating their qualified privilege.  *See Joftes v. Kaufman*, 324 F. Supp. 660, 664 (D.D.C. 1971) (no excessive publication where the challenged letter was opened and read by the plaintiff's wife, who lacked a legitimate interest in its contents, "through no fault of defendants"); *Gabauer v. Woodcock*, 520 F.2d 1084, 1095 (8th Cir. 1975) (defendants not liable for excessive publication where plaintiffs failed to submit evidence that defendants were in fact responsible for the publication in question).  Plaintiffs' allegations of excessive publication involving various meetings between NAGE officials and the local membership are also insufficient to defeat the privilege.  While plaintiffs have suggested that the statements were "spoken loudly with doors open [so that] any passerby could hear" (Pls.' Opp'n at 45), they have provided no evidence to indicate that the remarks were actually overheard by persons without a legitimate interest in them.  Finally, plaintiffs' challenge to the posting of the emergency trusteeship and hearing notices is without merit as their placement on the union's bulletin boards was reasonably calculated to further the union's interest in notifying members of the actions and plaintiffs have not shown communication to any nonmember.  (*See* Bernsen Decl. Ex. 26.)  Plaintiffs have thus failed to show that the defendants' privilege was defeated by the excessive publication of the statements in question.

Plaintiffs also suggest that defendants defeated their privilege by making statements "imput[ing] the commission of a criminal offense," statements amounting to "defamation *per se*."  (Pls. Opp'n at 47-48.)  According to plaintiffs, because some of the challenged statements accused Johnson and Bernsen of engaging in criminal activity, "actual malice need not be proved in this case."  (*Id.* at 48.)  Proof of defamation *per se*, however, frees a plaintiff only from the burden of proving damages; it does not supply proof of actual malice for purposes of

establishing liability.  *See Washburn v. Lavoie*, 357 F. Supp. 2d 210, 214 (D.D.C. 2004) ("Acting

as an exception to the general rule that libel is not actionable unless actual damages are

demonstrated, the District of Columbia recognizes charges of criminal conduct as libelous per

se.").  Plaintiffs' argument regarding actual malice, therefore, is without merit.

Because plaintiffs have failed to overcome defendants' common interest privilege,

Counts 7 and 8 are dismissed with prejudice.

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is DENIED

respect to plaintiffs' substantive Title I challenge to their discipline in Counts 5 and 6 and with

respect to Valda T. Johnson and Stuart E. Bernsen's Title VII claims of retaliatory removal from

office and retaliatory discipline in Counts 3 and 4.  Defendants' motion for summary judgment is

GRANTED in all other respects.  Summary judgment is therefore entered on behalf of

defendants Stephanie Zaiser and Gerald Flynn, and plaintiff Elizabeth Baker's claims are

dismissed with prejudice.  Defendants' motion to strike is also DENIED AS MOOT.

s/<br>
_____<br>
ELLEN SEGAL HUVELLE<br>
United States District Judge

Date:  December 6, 2005